(879 P.2d 638)
No. 70,605

DONALD P. RICHARDS, *Appellant,* v. DAVID M. BRYAN, EDWYN R. BRYAN, MARGIE E. BRYAN, GINNY DARK, and BRYAN WORLD TOURS, INC., *Appellees.*

Opinion

filed August 12, 1994.

Richard F. Hayse, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, and Jeffery L. Carmichael and Jana D. Abbott, of Morris, Laing, Evans, Brock·& Kennedy, Chartered, of Wichita, for appellant.

Randall J. Forbes and S. Eric Steinle, of Frieden, Haynes & Forbes, of Topeka, for appellees.

Before GREEN, P.J., BRAZIL, J., and DAVID L. THOMPSON, District Judge, assigned.

THOMPSON, J.: This appeal arises from an action for personal damages brought by Donald Richards (Richards) against the majority shareholders of Bryan World Travel of Overland Park, Inc. (Travel). Richards, a minority shareholder in Travel, appeals the trial court's grant of summary judgment in favor of the defendants, claiming that the majority effectively froze him out of all management decisions and denied him a reasonable return on his investment. Richards further contends that the majority fraudulently induced him to invest in Travel and then breached the formation agreement. Richards also appeals the trial court's imposition of sanctions against him for failure to comply with a discovery order.

In the summer of 1982, Richards met with David Bryan of Bryan World Tours, Inc. (Tours) in order to discuss a possible business relationship. A short time after the first meeting, David Bryan gave Richards a document entitled "Introducing Bryan Travel Service Partnership Plan" (Partnership Plan) which described how an interested investor could establish a branch office of Tours by contributing capital and services to the enterprise. The Partnership Plan contained various estimates of expenses and earnings based upon Tours' experience in the travel industry in Topeka. The Partnership Plan stated that

"[b]eginning with the second year, the President-investor will receive a salary of $2,000 per month ($24,000 per year). This salary will thereafter remain the same and future increases in the President-investor's remuneration will come in the form of 49% participation in the profits of the company and will be given in the form of dividends or a bonus."

The Partnership Plan estimated that in three or four years the president's annual income would be $91,688. The Partnership Plan also contained the following disclaimer:

"This proposal has not been read or approved by any official or semi-official agency of the government nor has it been analyzed by any accountant or any professional investment advisors.

"This document is not a solicitation to sell stock. This is intended to set forth the possibilities of a working 'partnership' between our company and the right person. The figures used to arrive at our conclusions are based on the experience of BRYAN WORLD TOURS in Topeka and upon assumptions and projections.

"We have made no promises or agreements that are not set forth in writing and signed by both parties.

"It is the responsibility of the prospective President-investor to analyze the possibilities with the aid of his own independent advisor and then decide if he/she is willing to accept whatever financial risks are involved."

Richards did not seek the advice of an attorney or a financial advisor concerning any of the information in the Partnership Plan before deciding to enter into a business relationship with Tours.

On October 13, 1982, Travel was incorporated pursuant to the terms and conditions of a contract called the "Articles of Agreement" (Agreement). Under the Agreement, Richards was to invest $35,000 as operating capital and to serve as president and chief executive officer of Travel for one year without pay. In exchange for this investment, Richards and his wife would receive 49% of the capital stock of Travel and, beginning October 15, 1983, Richards was to receive a salary of $24,000 per year for his services. The remaining 51% of Travel was to be owned by Tours, whose stockholders, directors, and officers are David Bryan, Edwyn Bryan, Margie Bryan, and Ginny Dark. The Agreement contains the following language concerning the employment of Richards:

"7. Officers: Richards will serve as President and Chief Executive Officer of the new corporation and will continue to be appointed as such at the annual Board of Directors meetings as long as he is performing his duties credibly. However, in no case, save sale of Richards' stock, will he lose his share in the profits and life of the company."

In exchange for a management fee equal to 1% of the gross annual sales of Travel, Tours promised to provide training for officers and staff of Travel at the Bryan Travel College, to interface Travel's computer system with the computer system of Tours, to prepare applications to qualify Travel as a travel agency, to provide continuing management assistance in the form of monthly

financial reports and payroll checks, and to supply all legal work for the formation of Travel.

The Agreement provided that after Travel had been in operation for three years, Richards had the right to purchase all or any number of additional shares of stock. The formula for valuation of the stock was established to be one-half of the past annual gross sales of Travel, divided by the total number of shares outstanding. All additional shares purchased by Richards were to remain nonvoting until such time as 100% of the stock was purchased by him.

Finally, the Agreement stated: "These two parties have set out fully their agreement with relationship to each other and there is no other except what is contained herein. Any addition or changes must be set out in writing and signed by both parties." The Agreement made no mention of bonuses or dividends. At the first meeting of incorporators on October 20, 1982, David Bryan, Edwyn Bryan, Margie Bryan, and Donald Richards were elected to the board of directors of Travel. The Articles of Agreement were also ratified at this time, as were the bylaws of the corporation. Richards was not present at this meeting. The bylaws contained the following provisions concerning dividends and finance:

"Section 1. Dividends, to be paid out of the surplus earnings of the corporation, may be declared from time to time by resolution of the Board of Directors; but no dividend shall be paid that will impair the, capital of the corporation.

"Section 2. The funds of the corporation shall be deposited in such bank or trust company as the directors shall designate, and shall be withdrawn only upon the check or order of the President, Executive Vice President, Treasurer or Chairman of the Board."

Concerning the duties and responsibilities of the officers, the bylaws stated:

"Section 2. The President shall preside at all directors' and stockholders' meetings; shall have general supervision over the affairs of the corporation, and over the other officers; shall sign all stock certificates and written contracts of the corporation and shall perform all such other duties as are incident to this office.

"Section 3. The Executive Vice President shall manage the general day-to-day business of the corporation and have all powers incident to carrying out this office including but not limited to: writing corporate checks and

making corporate deposits, hiring, firing, and supervising all other corporate employees, keeping such records as may be required by law or the Board of Directors on a daily basis, etc."

Edwyn Bryan was unanimously elected executive vice-president of Travel at the October 20 meeting of the board of directors.

As agreed, Richards served as president and chief executive officer of Travel for the first year of its operation without drawing a salary. Richards began receiving his salary of $2,000 per month on October 15, 1983, and continued to receive that salary until the conclusion of his employment relationship with Travel on December 31, 1987. No dividend or bonus has ever been authorized by Travel's board of directors, and, in the five years he was employed by Travel, Richards never received any income beyond his monthly salary.

Tours provided financial backing to Travel through a series of loans made without Richards' knowledge or consent. No formal agreement was ever drawn up concerning how or when the loans were to be repaid, but it was understood that Travel would make payments on the loans whenever it had any kind of surplus cash flow. Tours assessed interest against the loans at the prevailing market rates. In addition to making loan payments, Travel was obliged to pay Tours the agreed-upon management fee equal to 1% of the monthly gross sales.

The board of directors became dissatisfied with Richards' job performance in late 1987 when Richards began turning in weekly reports on an irregular basis. Also in late 1987, Richards allowed Travel to establish a separate bank account for corporate funds without seeking authorization from the board of directors. Information from the secret account was not forwarded to Tours' accounting office in Topeka, nor was the board informed about the account once it was established. The board of directors also claims to have received information at about this time that Richards was sexually harassing female employees.

A meeting of Travel's board of directors was held on December 8, 1987, at which it was decided that Richards should either be terminated or asked to resign. In a letter dated December 11, 1987, Richards notified the board of his planned resignation effective January 31, 1988. On December 30, 1987, David Bryan

wrote to Richards, dismissing him as president effective immediately.

In February 1989, the board of directors unanimously passed a resolution establishing an executive committee to manage the business of Travel during the interim between director's meetings. Edwyn Bryan and Ginny Dark were elected to the committee by a majority vote of the board. Also at the meeting, Ginny Dark was appointed president of Travel, and her salary was set at $24,000. David Bryan reported that Travel was expected to make a profit for the fiscal year ending in April 1989 but that any such profits should be used to pay down indebtedness and to build a strong cash position for protection against future downtrends in the market. It was suggested that until such time as Travel accumulated $200,000 to invest in additional travel agencies, no dividends should be declared by the board.

On July 11, 1990, Richards filed suit generally alleging fraud, breach of contract, and breach of fiduciary duty on the part of Tours, its directors, officers, and shareholders. After over two years of pretrial motions and scheduling, a discovery dispute arose between the parties concerning the deposition of one of Richards' experts.

In order to comply with the trial court's scheduling order, the parties agreed that the deposition of Richards' expert would take place on October 26, 1992. By agreement of the parties, that date was rescheduled until November 10, 1992. Although a notice to take the deposition of the expert was issued on November 9, 1992, at 4:00 p.m., Richards' counsel faxed a Motion for Protective Order to defendant's counsel at 4:02 that same afternoon. The basis for Richards' request for a protective order was that one of his two attorneys had just withdrawn from the case and that some of the materials addressed in the "Duces Tecum Request" were protected work product. Defendants' counsel appeared at the deposition as scheduled, but neither Richards' counsel nor his expert appeared. Defendants filed a response to the motion for protective order on November 18, 1992, seeking an order directing discovery and for sanctions.

In a letter dated November 19, 1992, Judge Bullock denied Richards' motion for protective order and granted defendants' motion for discovery and sanctions. Richards was ordered to pay

the costs of preparing for the expert's deposition and for the costs of preparing the defendants' response to the motion for protective order.

On September 22, 1993, the trial court granted defendants' motion for summary judgment in a lengthy decision and order. The court concluded that Richards' claim of fraud was insufficient as a matter of law because defendants did not possess superior knowledge as to the business venture, defendants performed all of the promises they made in the Agreement, and Richards had not shown any damage due to the alleged misrepresentations of the defendants. The court dismissed Richards' claim for breach of contract, finding that Richards was an employee-at-will and the directors were authorized to remove him "at their pleasure." The court also found in favor of the defendants on Richards' breach of fiduciary duty claim, stating that Travel actually was benefited by the loans from Tours and that Richards failed to prove the services promised by Tours were not provided.

Richards timely appeals the entry of summary judgment against him and the trial court's order imposing sanctions in the discovery dispute.

## STANDARD OF REVIEW

A trial court "has inherent power to dispose summarily of litigation where no genuine issue exists as to any material fact." *Collins v. Meeker*, 198 Kan. 390, 393, 424 P.2d 488 (1967). "The purpose of summary judgment is to avoid trial where there is no real issue of fact." *Bethany Medical Center v. Knox*, 10 Kan. App. 2d 192, 193, 694 P.2d 1331 (1985). However, " '[m]ere surmise or belief by the trial court, no matter how reasonably entertained, that a party cannot prevail upon a trial will not justify refusing that party his day in court.' " *Bockhaus v. City of Halstead*, 242 Kan. 504, 506, 748 P.2d 870 (1988) (quoting *Hunt v. Dresie*, 241 Kan. 647, 740 P.2d 1046 [1987]).

Because a summary judgment denies one of the litigants his or her right to a trial, courts have generally construed the pleadings liberally in favor of the party opposing the motion. *Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 448, 681 P.2d 630 (1984). Our Kansas Supreme Court has cautioned that "[a] summary judgment proceeding is not a trial by affidavits, and the parties must always

be afforded a trial when there is a good faith dispute over the facts." *Brick v. City of Wichita*, 195 Kan. 206, 211, 403 P.2d 964 (1965). The scope of appellate review is to read the record in the light most favorable to the party who defended against the motion for summary judgment, and "where reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Bank of Alton v. Tanaka*, 247 Kan. 443, 446, 799 P.2d 1029 (1990).

However, the party defending against the motion for summary judgment must establish each element of his or her cause of action in order to avoid summary judgment. *Dozier v. Dozier*, 252 Kan. 1035, 1041, 850 P.2d 789 (1993). " 'The moving party is entitled to a judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.' " 252 Kan. at 1041 (quoting *St. Francis Regional Med. Center, Inc. v. Hale*, 12 Kan. App. 2d 614, Syl. ¶ 1, 752 P.2d 129 [1988]).

## CONTRACT CLAIM

Richards claims that the defendants breached the Articles of Agreement by failing to provide the promised training and management services to Travel and by terminating his employment with Travel.

Richards' principal breach of contract claim involves his termination as president and chief executive officer of Travel. The terms of Richards' employment were set forth in the Agreement, which constituted the sole contract between the parties, as stated clearly in its provisions. The terms of Richards' employment were governed by the Agreement's employment clause, which states:

"Richards will serve as President and Chief Executive Officer of the new corporation and will continue to be appointed as such at the annual Board of Directors meetings as long as he is performing his duties credibly. However, in no case, save sale of Richards' stock, will he lose his share in the profits and life of the company."

The construction of a contract is a question of law, and an appellate court's review of conclusions of law is unlimited. *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 691, 840 P.2d 456 (1992); *City of Chanute v. Polson*, 17 Kan. App. 2d 159, 160, 836 P.2d 6 (1992). A contract will be enforced as written

so long as its terms are certain and do not conflict with pertinent statutes or with public policy. See *Penalosa Co-op Exchange v. Farmland Mut. Ins. Co.*, 14 Kan. App. 2d 321, Syl. ¶¶ 1, 3, 789 P.2d 1196, *rev. denied* 246 Kan. 768 (1990).

The trial court's conclusion that the board of directors could fire Richards for any reason, at its pleasure, is not supported by the language of the Agreement. Under the Agreement, the board promised to continue to appoint Richards as president *as long as he is performing his duties credibly*. The fact that the Model Business Code and the common law allow directors to remove a corporate officer with or without cause is irrelevant to Richards' claim. The board of directors was bound by contract to continue Richards' employment until such time as he failed to perform his duties credibly.

A close reading of the record shows that there are several genuine issues of material fact concerning Richards' termination. For example, it is not clear whether Richards voluntarily resigned or was discharged by the board. The allegations of sexual harassment against Richards are bald assertions with no substantiation in the record. The charges of general mismanagement by Richards are similarly vague and unproven. Although Richards admits to the existence of Travel's "secret" bank account, it is not clear who set it up, what purpose it was intended to serve, or how much money was actually "hidden" there.

Whether Richards was performing his job "credibly" is a question of fact to be determined by the trier of fact. Although the district court concluded that opening a secret bank account and submitting weekly reports on an irregular basis raise a cognizable suspicion of dishonesty, finding that the board was therefore justified in terminating Richards necessarily required the court to weigh the evidence and evaluate the witnesses. That is not the function of the court on a motion for summary judgment. Richards must be given the opportunity to present his evidence concerning his termination at trial.

Richards' other breach of contract claims involve the failure of Tours to provide promised services to Travel. As defendants point out, when Travel ratified the Articles of Agreement, it became the contract of the corporation, entitling the corporation to the benefits and liabilities therein. *Boatright v. Steinite Radio Corp.*,

46 F.2d 385, 388 (10th Cir. 1931). Richards cannot sue on his own behalf for a breach of provisions of the contract which dealt specifically with the corporation. See *Boatright*, 46 F.2d at 388 (Boatright had no standing to sue on his own behalf, but if the corporation refused to do so, he could sue in his own name but for the benefit of the corporation). Because Richards has no standing to sue on his own behalf for Tours' alleged failure to provide contracted services, the summary dismissal of those claims is affirmed.

## FRAUD CLAIM

Richards contends the defendants' Partnership Plan was fraudulent in that it induced him to invest in Travel on the basis of misrepresentations and falsehoods. Richards further argues that the grant of summary judgment was improper as to his fraud claim because the existence of fraud is almost always a question of fact.

K.S.A. 1993 Supp. 60-513(a)(3) provides that an action for relief on the ground of fraud shall be brought within two years of the discovery of the fraud.

The representations which Richards claims are fraudulent were contained in the Partnership Plan presented to him in 1982. He argues that those representations led him to believe that he would receive a dividend or a bonus each year after the first and that his salary would eventually reach $91,000.

In 1987, Richards' employment with Travel was terminated. As of that time he had never received a bonus or a dividend. He was aware of the loan payments and the management fee, and of the effect those obligations had on the profitability of Travel, yet he waited until 1990 to file his damage suit claiming fraud.

Richards was aware of all the facts he presented to support his fraud claim at the time of his termination. Although the parties dispute the exact date when Richards' employment with Travel was terminated, Edwyn and David Bryan told Richards, on December 10, 1987, that the board of directors wanted Richards to resign, and if he failed to resign, he would be fired. Clearly, Richards knew that his employment with the company was over on December 10, 1987. Consequently, the statute of limitations

should have begun running at that time. The filing of the present lawsuit three years later was untimely under K.S.A. 1993 Supp. 60-513(a)(3). Although the trial court based its summary dismissal of Richards' fraud claim on other grounds, its decision is affirmed as correct, even if for the wrong reason. See *Sharp v. State*, 250 Kan. 408, Syl. ¶ 6, 827 P.2d 12, *cert. denied* 121 L. Ed. 2d 137 (1992).

## BREACH OF FIDUCIARY DUTY CLAIM

Richards argues that the majority shareholders in Travel breached their fiduciary duty by denying him the expected benefits of his investment in Travel. At the heart of Richards' fiduciary duty claim is the allegation that defendants financially manipulated Travel to make it appear, at least on paper, to be unprofitable and thus avoid payment of additional compensation to Richards in the form of dividends and bonuses.

### Standing

"Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders." *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 451, 467, 790 P.2d 404 (1990). When a shareholder believes that an officer or director of the corporation has breached his or her fiduciary duty, the shareholder may file a derivative action under K.S.A. 60-223a or, in certain circumstances, an individual damage suit.

A claim is said to be derivative if injury is either to the corporation directly or to the shareholder but mediated through the corporation. *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383 (7th Cir. 1990), *cert. denied* 500 U.S. 952 (1991); *McDaniel v. Painter*, 418 F.2d 545, 547 (10th Cir. 1969). A shareholder may only litigate as an individual if the wrong to the corporation inflicts a distinct and disproportionate injury on the shareholder, or if the action involves a contractual right of the shareholder which exists independently of any right of the corporation. *Bagdon*, 916 F.2d at 383; *Moran v. Household Intern., Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985). "Whether a cause of action is individual or derivative must be determined from the 'nature of the wrong alleged' and the relief, if any, which could result if

plaintiff were to prevail." *Kramer v. Western Pacific Industries*, 546 A.2d 348, 352 (Del. 1988).

In the present case, most of the wrongdoing alleged by Richards would have injured the corporation directly. Richards claims that the majority shareholders arranged for capital contributions from Tours to Travel and then treated them as loans in order to siphon profits from Travel back to Tours. Clearly, if true, this would be an injury to Travel. Richards' injury would be indirect, resulting from the injury to the corporation. Similarly, Richards claims that Tours failed to provide the management and training services for which Travel was paying 1% of its gross sales. Again, if true, the injured party would be Travel, with Richards suffering only derivative injury.

Richards' claim of injury arising from the termination of his employment with Travel is distinct to him, but his proper cause of action lies in contract and not in breach of fiduciary duty. Courts have held that directors do not breach a fiduciary duty if they fire an employee, who is also a shareholder, for a legitimate business reason. See *Harris v. Mardan Business Systems, Inc.*, 421 N.W.2d 350, 353 (Minn. App. 1988). Richards did not argue that Travel had no legitimate business reason to discharge him; rather, he argued that his termination was contrary to the terms of his contract. For that reason, Richards' wrongful discharge complaint is considered solely under his breach of contract claim.

Because all of the other injuries alleged by Richards in his breach of fiduciary duty claim are injuries to the corporation itself, Richards should have filed a shareholders derivative action under K.S.A. 60-223a and not an individual damage suit.

### Close Corporation Exception

In a close corporation, the corporation is generally composed of a majority shareholder or group and a minority shareholder or group. Because of the difficulty in determining if a suit must be brought as a direct or a derivative action, an increasing number of courts are abandoning the distinction between a derivative and a direct action because the only interested parties are the two sets of shareholders. Furthermore, some courts have recognized that it is often difficult and futile to bring a derivative action against a closely held corporation. As explained by one authority,

"[e]ven if a minority shareholder overcomes procedural hurdles in a derivative action, a strong disadvantage is that any recovery accrues to the corporation and hence remains under the control of the very parties who may have been defendants in the litigation." 2 O'Neal and Thompson, O'Neal's Close Corporations § 8.11, p. 122 (3d ed. 1992). For this reason, some courts permit oppressed minority shareholders to bring direct suits for breaches of fiduciary duties by the majority, even though the minority shareholders' grievance is primarily based on damage to the corporation. 2 O'Neal and Thompson, O'Neal's Close Corporations § 8.11, p. 122. Some courts allow such suits under an exception to the standing to sue doctrine, while other courts recognize a new cause of action for close corporation freeze-outs. See generally *Bagdon v. Bridgestone/ Firestone, Inc.*, 916 F.2d 379 (Ohio law allows minority shareholders in close corporations to sue individually for oppressive majority conduct under an exception to the standing doctrine); *Balvik v. Sylvester*, 411 N.W.2d 383 (N.D. 1987) (oppressed minority shareholders may bring an independent action against majority shareholders under a freeze-out theory, when their reasonable expectations are thwarted by majority conduct); *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282 (1986) (there is no need to file a derivative action when a corporate "squeeze-out" harms a minority shareholder in a close corporation).

In its Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), p. 731 (Tentative Draft No. 11, 1991), the American Law Institute recommends allowing an independent cause of action for freeze-outs in the close corporate setting under certain circumstances:

"If a corporation is closely held . . . , the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation . . . to a multiplicity of actions, (ii) materially prejudice the interests of creditors in the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons."

See *Schumacher v. Schumacher*, 469 N.W.2d 793, 798-99 (N.D. 1991).

The creation of this cause of action and its endorsement by the American Law Institute has met with strong criticism from conservative jurists and scholars. In *Bagdon*, for example, Judge Easterbrook wrote:

"Ohio, like a few other states, has expanded the 'special injury' doctrine into a general exception for closely held corporations, treating them as if they were partnerships. . . . The American Law Institute recommends that other states do the same. [Citation omitted.] The premise of this extension may be questioned. Corporations are *not* partnerships. Whether to incorporate entails a choice of many formalities. Commercial rules should be predictable; this objective is best served by treating corporations as what they are, allowing the investors and other participants to vary the rules by contract if they think deviations are warranted. So it is understandable that not all states have joined the parade." 916 F.2d at 383-84.

The Supreme Court of Kansas has never expressly ruled on the issue of whether an oppressed minority shareholder in a close corporation can bring a direct action alleging a breach of fiduciary duties when all of the alleged harm was suffered by the corporation itself. However, in *Sampson v. Hunt*, 233 Kan. 572, 584-85, 665 P.2d 743 (1983), the court held that "directors have the power to control and direct the affairs of the corporation, and in the *absence of fraud*, courts will generally not interfere on behalf of a dissatisfied stockholder with the discretion of the directors on questions of corporate management, policy or business." (Emphasis added.)

Because the underlying complaint in a minority shareholder freeze-out is the failure of the close corporation to fulfill the shareholder's reasonable expectations, such actions necessarily involve at least one claim of fraud. The present case is no exception. Although the statute of limitations for fraud had expired, Richards presented substantial evidence of fraudulent inducement on the part of Tours.

In *Sampson*, the Kansas Supreme Court expressed its intent to intervene on behalf of dissatisfied shareholders if corporate directors behave fraudulently. It follows that the Supreme Court would recognize an exception to the requirement that a minority shareholder bring a derivative action when frozen out of the management of a close corporation through oppressive majority conduct.

Therefore, we conclude that if a corporation is closely held, a court, in its discretion, may treat an action raising derivative claims as a direct action if it finds to do so will not (1) unfairly expose the corporation to a multiplicity of actions; (2) materially prejudice the interests of creditors in the corporation; or (3) interfere with a fair distribution of the recovery among all interested persons.

In the present case, allowing Richards to bring a direct action for his derivative claims will not expose Travel to a multiplicity of actions or interfere with a fair distribution of recovery because Richards and his wife are the only minority shareholders in the corporation. Furthermore, this is not a debtor-creditor action, and there is no indication that a resolution of Richards' claims will prejudice any creditors' interests. Therefore, Richards should be allowed to pursue his breach of fiduciary duty claim, provided' that he presents sufficient evidence in the district court to defeat the defendants' motion for summary judgment.

### Prima Facie Showing

*Newton v. Hornblower, Inc.*, 224 Kan. 506, 518, 582 P.2d 1136 (1978), held:

"Any unfair transaction induced by a fiduciary relationship between the parties gives rise to a liability with respect to unjust enrichment of the fiduciary. Where such transaction is attacked, the burden of proof is on the fiduciary to establish the fairness of the transaction, and to this end he must fully disclose the facts and circumstances, and affirmatively show his good faith."

*Newton* requires a complaining party to offer more than a bald allegation of impropriety, while still assigning the ultimate burden of proof to the fiduciary. This somewhat confusing shift in the burden of proof was very well explained in *Cookies Food Products v. Lakes Warehouse*, 430 N.W.2d 447 (Iowa 1988). In *Cookies*, the plaintiff was first required to make out a prima facie showing of self-dealing. After that was established, the burden then shifted to the defendant to prove that its actions were done in good faith. After the defendant presented its evidence, the plaintiff was then afforded the opportunity to counter with rebuttal arguments. 430 N.W.2d at 453.

Because the present case was decided on a motion for summary judgment, Richards was required to present facts which, when

viewed in the light most favorable to him, established a prima facie case of breach of fiduciary duty. It is clear from a close reading of the record that Richards met this burden of proof.

Richards claimed that the loans made to Travel from Tours were really capital contributions, with the loan payments constituting disguised dividends for Tours. In support of this claim, he submitted a deposition in which he stated that he did not approve of any of the loans and that the loans siphoned off all of Travel's profitability. Richards also submitted a deposition from an expert witness who questioned the nature of the loans. Whether a cash advance to a corporation is intended as capital or as a loan is a question of fact for the trial court, as the trier of fact. See *Laybourn v. Director of Revenue*, 204 Kan. 77, 79, 460 P.2d 591 (1969). While falling far short of ultimately proving his allegation, Richards' evidence did create a question of fact which was adequate to establish a prima facie showing.

Similarly, Richards alleged that the 1% management fee paid by Travel each month was excessive and that Tours did not provide many of the services it promised in return. Richards' deposition, accompanied by his expert's statement that the services performed by Tours were virtually worthless, should have been enough to establish a prima facie showing of breach of fiduciary duty.

Perhaps one of the most serious charges raised by Richards was that no board of directors meeting was ever held on October 20, 1982, and that the defendants created the record of that meeting at a later date in order to impose bylaws with no input from Richards. The bylaws are critical to this case because they define the duties of the corporate officers and give discretion to the board of directors in declaring dividends. The testimony in the depositions was incomplete and confusing concerning this meeting, and coupled with Richards' statement that it never occurred, there was evidence to establish a prima facie case on this question.

For all of these allegations, then, Richards presented sufficient evidence to shift the burden of proof to the defendants. Instead of requiring proof from the defendants, however, the court evaluated the evidence and found that Richards had not proven his allegations. In so doing, the court improperly required Richards

to prove his entire case at the summary judgment stage. Because a reasonable belief by the trial court that a party cannot prevail upon trial is insufficient to justify granting a motion for summary judgment, the district court erred in finding that the defendants were entitled to judgment as a matter of law on the issue of breach of fiduciary duty.

## DISCOVERY SANCTIONS

Richards argues that the trial court abused its discretion in assessing costs against him for the deposition of his expert and for preparation of the defendants' motion in opposition to his motion for protective order because the district court had no statutory authority for the award under the circumstances.

It is well settled that trial courts have inherent power to impose sanctions for litigation misconduct. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991). The standard of review of a trial court's discovery order, including orders granting sanctions, is abuse of discretion. *City of Arkansas City v. Anderson,* 19 Kan. App. 2d 344, 349, 869 P.2d 244 (1994).

The facts in this case indicate that Richards agreed to make his expert available for deposition on November 10, 1992. At 4:02 in the afternoon of November 9, 1992, Richards filed a motion with the court requesting a protective order to halt the deposition. The court concluded, without elaboration, that Richards' motion for protective order should be denied and that his behavior should be sanctioned.

K.S.A. 1993 Supp. 60-226(c) provides, in part:

"If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. *The provisions of K.S.A. 60-237 apply to the award of expenses incurred in relation to the motion.*" (Emphasis added.)

K.S.A. 60-237(a)(4) provides:

"(4) . . . If the motion [to compel discovery] is granted, the judge shall, *after opportunity for hearing,* require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the judge finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." (Emphasis added.)

It was well within the prerogative of the trial court to sanction Richards for his conduct in this matter. However, the trial court did not follow the proper procedure in imposing the sanctions. Under K.S.A. 60-237(a)(4), a court is required to afford a litigant the opportunity for a hearing on his or her motion for a protective order and on the other party's motion to compel discovery *before* sanctions can be imposed. The trial court did not conduct a hearing on the motions but imposed sanctions in a letter written to the parties the day after receiving the defendants' motion to compel. Therefore, the sanction order should be vacated and the matter remanded to the district court for a hearing on the motions.

Affirmed in part, reversed in part, and remanded with directions.