**SAFETY TECHNOLOGIES, L.C., Plaintiff,**

v.

**BIOTRONIX 2000, INC., Defendant.**

**No. 98–2555–JWL.**

United States District Court, D. Kansas.

March 1, 2001.

---

Michael A. Millett, Berman & Rabin, P.A., Overland Park, KS, Shawn E. De-Graff, Shawnee, KS, for Plaintiff.

Gene A. DeLeve, John B. Rowatt, Christy M. Caddell, Berman, DeLeve, Kuchan & Chapman, Arthur H. Stoup, Stephen W. Nichols, Arthur H. Stoup & Associates, P.C., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On November 26, 2000, a jury returned a verdict in favor of plaintiff Safety Technologies, L.C. ("Safety Technologies") against defendant Biotronix 2000, Inc. ("Biotronix 2000") for $45,733 in damages and found that the plaintiff was also entitled to an award of punitive damages. On February 5, 2001, this court held a hearing to set punitive damages, as directed by K.S.A. § 60–3702, and to hear argument on the defendant's motion for judgment as a matter of law.[1] For the reasons set out below, the defendant's motion for judgment as a matter of law is denied and the court awards punitive damages to the plaintiff in the amount of $50,000.

- Judgment as a matter of law

■ At the close of the plaintiff's case, Biotronix 2000 moved for judgment as a matter of law. The motion listed 21 issues on which the defendant suggested that there was no legally sufficient evidence for a reasonable jury to find for the plaintiff.[2] The court agreed with the defendant on one issue and dismissed plaintiff Kenneth Norris from the case.[3] The remainder of the motion was taken under

---

1. The motion for judgment as a matter of law was filed by Biotronix 2000 at trial and taken under advisement by the court. A response and reply were filed subsequent to trial.

2. The motion did not discuss the evidence presented at trial, but simply listed issues for the court to consider.

3. The court agreed that the plaintiff failed to present legally sufficient evidence showing that Mr. Norris, as a member of Safety Tech-

advisement. At the February 5 hearing, Biotronix 2000 abandoned all but two of the issues listed in its Rule 50 motion. Biotronix 2000 argued only that there was no legally sufficient evidence to prove that (1) any agent of Biotronix 2000 made representations to the plaintiff about FDA certification and (2) any statements concerning FDA certification were material.

 Biotronix 2000· is entitled to judgment as a matter of law only if the "evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir.2000). If the evidence "supports a reasonable inference favorable to the jury verdict, the fact that a contrary inference may be drawn does not mandate the entry of judgment as a matter of law." *Id.* at 1289.

 The defendant's argument that there was no evidence of any representations made by an agent of Biotronix 2000 to Safety Technologies is without merit. The jury returned a verdict in favor of the plaintiff on the claim of fraud by silence. The elements of a fraud by silence claim in Kansas, as set out in the instructions, are:

1. The defendant had knowledge of material facts which the plaintiff did not have and which the plaintiff could not have discovered by the exercise of reasonable diligence;

2. The defendant intentionally failed to communicate to plaintiff the material facts;

3. The defendant intended or had reason to expect that the plaintiff would act in reliance upon the defendant's non-disclosure.

4. The plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and

5. The plaintiff sustained damages as a result of the defendant's failure to communicate this to the plaintiff.

 *See* P.I.K.3d § 127.41. Fraud by silence does not require a representation by the defendant. Instead, the evidence must show that the defendant failed to disclose a material fact to the plaintiff. Biotronix 2000 is not entitled to judgment as a matter of law because the evidence presented at trial supports a reasonable inference favorable to the jury's verdict without evidence of a representation by an agent of Biotrionix 2000.[4]

---

nologies, would incur a unique or disproportionate injury that was foreseeable to the defendant. A plaintiff may recover damages for fraud only if they are a foreseeable consequence of the fraud. *See Mattingly, Inc. v. Beatrice Foods Co.*, 1983 WL 2184, \*3 (D.Kan. Aug. 10, 1983); Restatement (Second) of Torts § 549 cmt d (1977). A shareholder in a corporation may not sue individually if the harm to the shareholder is derivative. "A shareholder may only litigate as an individual if the wrong to the corporation inflicts a distinct and disproportionate injury on the shareholder, or if the action involves a contractual right of the shareholder which exists independently of any right of the corporation." *Richards v. Bryan*, 19 Kan.App.2d 950, 961, 879 P.2d 638 (1994). The court believes that the Kansas Supreme Court would also apply this precedent limiting lawsuits by indi-

vidual shareholders to limit lawsuits by members of limited liability companies. *See Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 293 (1999) ("The derivative suit is a corporate concept grafted onto the limited liability company form.") The rationale of the rule, preventing the danger of multiplicitous suits by each shareholder, *see* 3A *Fletcher Cyclopedia of Private Corp.* § 1282 at 606–607 (1986), applies equally to corporations and limited liability companies.

4. The evidence presented at trial showed that Biotronix 2000 knew that Safety Technologies intended to purchase the needle incineration units for resale in the United States, that the FDA certification was necessary for such resale, and that Biotronix 2000 knew that the units did not have certification but did not disclose this to Safety Technologies.

■ The second argument made by Biotronix 2000, that there was insufficient evidence to show the materiality of its knowledge that the FDA had rescinded certification, also fails. A fact is material if it is one to which a reasonable person would attach importance in determining his or her choice of action in the transaction in question. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 524, 664 P.2d 813 (1983). Testimony at trial indicated that Safety Technologies bought the needle incineration units for resale in the United States and that FDA certification is necessary for such resale to be legal. A jury could conclude, based on this evidence, that a reasonable person would not purchase the units for resale in the United States without FDA certification. The evidence, therefore, was sufficient for a jury to decide that whether the units had FDA certification was a material fact.

■ Biotronix 2000 argued at the hearing that because Safety Technologies knew the importance of FDA certification, that it was unreasonable for Safety Technologies to rely on Biotronix 2000 to disclose that FDA certification was rescinded. Biotronix 2000 characterized this as a question of materiality, but the issue is whether Safety Technologies justifiably relied on Biotronix

2000 for notice that FDA certification was rescinded. "A party is justified in relying without investigation upon another to communicate the facts material to a transaction unless he or she knows or has reason to know of facts which make such reliance unreasonable." *Goff v. American Savings Association,* 1 Kan.App.2d 75, 82, 561 P.2d 897 (1977); *see* Restatement (Second) of Torts § 540; P.I.K.2d § 127.41. As explained earlier, a reasonable jury could conclude that whether the units had FDA certification was a material fact. If a reasonable jury could also conclude that Safety Technologies did not know or should not have known facts making it unreasonable to rely on Biotronix 2000 to disclose that FDA certification was rescinded, judgment as a matter of law is not appropriate.[5]

Evidence presented at trial indicated that the only reason Safety Technologies had to question the status of FDA certification was that Biotronix 2000 did not promptly verify certification or provide the certification numbers. A reasonable jury could conclude that this alone did not make it unreasonable for Safety Technologies to rely on Biotronix 2000 to communicate the fact that the FDA had rescinded certification. Safety Technologies had a letter from an attorney for Bitronix Laborato-

**5.** The evidence presented at trial showed that Biotronix 2000 knew that the FDA had rescinded certification. The purchase agreement whereby Biotronix 2000 purchased the assets of Biotronix Laboratories incorporates by reference a letter dated October 17, 1996, that indicates that the deputy director of the FDA informed Biotronix Laboratories that FDA certification was rescinded. The evidence also showed that Biotronix 2000 knew that counsel for Biotronix Laboratories, the predecessor of Biotronix 2000, told Safety Technologies by letter that the units had been approved by the FDA. A copy of the letter was sent to John Burne, a director of Biotronix Laboratories and, subsequently, an officer and agent of Biotronix 2000. Mr. Burne signed multiple letters admitted into evidence

at trial as the president of Biotronix 2000. Mr. Burne was also an employee of Group Crown, the company that marketed the units pursuant to a consulting agreement with Biotronix 2000. Pursuant to the consulting agreement, Group Crown was authorized to provide "consulting services which may be reasonably requested from time to time by the Board of Directors of the Corporation, including, without limitation, actively promoting interest in, and soliciting orders for, the products of [Biotronix 2000]." For this service, the agreement provided that Biotronix 2000 would pay Group Crown $155,000 per year. Letters admitted into evidence from Crown Group employees used Biotronix 2000 letterhead and Crown Group employees purported to work for Biotronix 2000.

ries assuring Safety Technologies that the units had FDA certification. Linda King, the president of Safety Technologies, testified that when she asked John Burne, an officer and agent of Biotronix 2000, for the FDA certification numbers she was told that they would be provided. A reasonable jury could conclude that Biotronix 2000's delay in providing the numbers did not amount to a red flag making it unreasonable for Safety Technologies to rely, without investigation, on Biotronix 2000 to communicate the fact that FDA certification was rescinded.

Even if a jury concluded that such reliance, without investigation, would be unreasonable, Linda King testified that Safety Technologies attempted to verify FDA certification on its own, but was unsuccessful. The evidence suggested that without the certification numbers, it would be difficult, if not impossible, for Safety Technologies to verify FDA certification.[6] A reasonable jury could conclude that reliance was justified in light of the fact that Safety Technologies attempted to verify certification but could not have been expected to succeed unless Biotronix 2000 provided the certification numbers.[7]

The evidence supports a reasonable inference favorable to the jury's conclusion that Biotronix 2000 failed to communicate to Safety Technologies a material fact and that Safety Technologies justifiably relied upon Biotronix 2000 to communicate that fact to the plaintiff. Biotronix 2000, therefore, is not entitled to judgment as a matter of law.

● Prejudgment interest

In its brief in support of punitive damages, Safety Technologies requests that the court order prejudgment interest. The allowance of prejudgment interest under Kansas law is a matter of judicial discretion. *See* K.S.A. § 16–201; *Miller v. Botwin,* 258 Kan. 108, 118, 899 P.2d 1004 (1995); *Crawford v. Prudential Ins. Co. of America,* 245 Kan. 724, 737, 783 P.2d 900 (1989). "The general rule in Kansas is that prejudgment interest is allowable on liquidated claims." *Miller,* 258 Kan. at 118, 899 P.2d 1004. "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation." *Kilner v. State Farm Mut. Auto. Ins. Co.,* 252 Kan. 675, 686, 847 P.2d 1292 (1993). Prejudgment interest is not recoverable when damages "are not ascertainable by computation, based on some fixed standard of measurement." *Foster v. City of Augusta,* 174 Kan. 324, 332, 256 P.2d 121 (1953).

In most tort cases, prejudgment interest is not appropriate under K.S.A. § 16–201 because the amount of damages due a plaintiff are not "fixed and certain" until a jury resolves questions of fact and the court enters judgment. *See, e.g., Whittenburg v. L.J. Holding Co.,* 838 F.Supp. 519, 519 (D.Kan.1993) (holding that where "the amount of damages was the primary issue in dispute," the plaintiffs' claim for damages was "not liquidated until the date the jury returned its verdict" and the plaintiffs are not entitled to prejudgment interest under K.S.A. § 16–

---

**6.** Ms. King testified that a search of the FDA database for a product description that matched the needle incineration units failed. The letter incorporated by reference into the purchase agreement indicating that the FDA had rescinded certification also said that the

FDA database still listed the units as having valid certification.

**7.** In fact, once Biotronix 2000 provided the certification numbers, Safety Technologies quickly determined that certification was rescinded.

201); *Torre v. Federated Mutual Ins. Co.,* 906 F.Supp. 616, 618 (D.Kan.1995) (holding that the amount of damages in a sex discrimination case "was in dispute until the court entered judgment on the jury verdict," the sum was not liquidated for K.S.A. § 16 201 purposes). In a fraud case, a concrete amount of money could be at issue, making damages fixed and certain prior to judgment. *See, e.g., FDIC v. Hudson,* 758 F.Supp. 663 (D.Kan.1991) (awarding prejudgment interest where plaintiff claimed that it loaned money to the defendant in reliance on misrepresentations by the defendant); *Soft Water Utilities, Inc. v. LeFevre,* 159 Ind.App. 529, 539, 308 N.E.2d 395 (1974) (holding that prejudgment interest was appropriate when plaintiff's damages from securities fraud "were ascertainable at the time of the sale in accordance with accepted standards of valuation."). On the other hand, prejudgement interest is not appropriate in a fraud case where a plaintiff's damages are not fixed and certain until judgment is entered. *See, e.g., Total Petroleum, Inc. v. Davis,* 822 F.2d 734, 738 (8th Cir.1987) (holding that prejudgment interest should not be added to damages awarded for misrepresentation because the amount of damages were not "liquidated or ascertainable" before the verdict); *Nelson v. Hench,* 428 F.Supp. 411, 421 (D.Minn.1977) (holding that prejudgment interest was not appropriate because the plaintiff's damages were not "readily ascertainable because at the time the cause of action arose" a fact question remained "for the Court to determine when the fraud terminated").

▮ Safety Technologies' damages were not fixed and certain prior to the jury's verdict. Safety Technologies paid

$40,000 to a third party for a shipment of units and received another shipment of units on consignment. Safety Technologies also claimed damages in the amount of set-up and operating expenses because the company was formed for the sole purpose of selling the units. This case is distinguishable from cases, such as securities fraud, where a plaintiff is defrauded out of a sum of money and there is no fact question about the amount of money lost by the plaintiff. The amount of damages incurred by Safety Technologies was not easily ascertainable, but was a question of fact for the jury. Pre-judgement interest, therefore, is not appropriate under Kansas law.

● Punitive damages

▮ K.S.A. § 60–3702(b) provides that the court may consider seven factors when determining the amount of punitive damages to be awarded. K.S.A. § 60–3702(b). The seven factors are not exclusive, *see Patton v. TIC United Corp.,* 859 F.Supp. 509, 513 (D.Kan.1994); *Scheufler v. General Host Corp.,* 915 F.Supp. 236, 240 (D.Kan.1995), and the determination of an amount of punitive damages should not be a purely mechanical application of these factors. The judge before whom the case was tried, who has been exposed to the evidence and can evaluate the nature of the conduct which gave rise to punitive damage liability, should exercise considerable discretion in fixing the proper amount to be awarded in order to accomplish the purposes for which punitive damages are authorized by statute.[8] The seven factors, however, provide a good framework for the court's analysis.

---

**8.** "In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 755 P.2d 1319, Syl. 6 (1988).

• Likelihood at the time of the misconduct that serious harm would arise from the defendant's misconduct

Harm from the defendant's conduct was almost certain. John Burne, an officer and agent of Biotronix 2000, knew that Safety Technologies intended to purchase the needle incineration units for resale in the United States and that the FDA certification was necessary for such resale.[9] Mr. Burne also knew that the units did not have certification and that Safety Technologies believed otherwise. There could be no question that Safety Technologies would lose money if it purchased the units believing that they could be resold in the United States.[10]

The more significant question is whether the loss would constitute "serious harm." To begin with, this is not a case where Biotronix 2000's actions risked causing personal injury. The risk, instead, was financial harm to Safety Technologies. Mr. Burne was aware that Safety Technologies was created for the sole purpose of reselling the units. It was, therefore, foreseeable to Biotronix 2000 that the failure to disclose the lack of certification would cause Safety Technologies to go out of business. On the other hand, Safety Technologies had only one employee, Linda King, and the company's expenses in purchasing and attempting to resell the units, including Linda King's salary, was only $100,443.73. While a loss of this amount to a large business probably would not be "serious harm," those with a financial stake in Safety Technologies were a handful of individual entrepreneurs and investors. To these individuals, a loss of that amount could be serious.

• The degree of the defendant's awareness of that likelihood

Biotronix 2000 knew that Safety Technologies intended to purchase the units for resale believing that they had FDA certification. Biotronix 2000 also knew that Safety Technologies was created by individual entrepreneurs and investors for the sole purpose of reselling the units. Biotronix 2000, therefore, was aware or should have been aware that its failure to disclose the fact that the FDA had rescinded certification risked putting Safety Technologies out of business and causing the individuals associated with Safety Technologies to suffer a potentially serious financial loss.

• The profitability of the defendant's misconduct

Biotronix 2000 did not realize any profit from its misconduct. On the other hand, Biotronix 2000 would have profited from its misconduct if BioEtec had paid Biotronix 2000 for the units sold to Safety Technologies. Biotronix 2000's misconduct was, no doubt, motivated by a desire for profit, if not an expectation of profit.

• The duration of the misconduct and any intentional concealment of it

The evidence presented at trial indicated that, upon formation, Biotronix 2000 knew that the FDA had rescinded certification

---

9. Linda King, president of Safety Technologies, testified that she had discussions with Mr. Burne about needing the FDA certification numbers to market the units in the United States. Howard Gordon, one of the founding members of Safety Technologies, testified that Mr. Burne told him that the units had valid FDA certification. Both Ms. King and Mr. Gordon testified that they had discussions with Mr. Burne about needing to provide the certification numbers to Wal Mart before Wal–Mart would purchase the units from Safety Technologies.

10. The only evidence suggesting that Biotronix 2000 believed that FDA certification was not necessary for resale in the United States was a sentence in the letter indicating that FDA certification was rescinded where an attorney suggests that "Biotronix's ability to market in the United States does not necessarily depend upon the continued viability of this 510(k)."

and that an attorney for Biotronix Laboratories had told Safety Technologies that the units had valid FDA certification. Thus, the time of the defendant's misconduct spans from the creation of Biotronix 2000 on October 31, 1996, to Safety Technologies' discovery in March of 1997 that the FDA certification had been rescinded.[11]

Mrs. King and the other individuals involved in Safety Technologies repeatedly asked Mr. Burne and Biotronix 2000 for verification of FDA certification. Biotronix 2000 did not provide verification or the FDA certification numbers which would allow Safety Technologies to verify FDA certification. The defendant's intentional failure to provide verification of FDA certification or the certification numbers constitutes continued misconduct as well as concealment of prior misconduct.

• The attitude and conduct of the defendant upon discovery of the misconduct

From its creation on October 31, 1996, Biotronix 2000 knew that an attorney for Biotronix Laboratories told Safety Technologies that the units had valid certification, that the FDA had rescinded certification and that Safety Technologies had not been told that certification was rescinded. Despite multiple requests to verify FDA certification, Biotronix 2000 failed to disclose this material fact.

• The financial condition of the defendant

Biotronix 2000 is no longer operating and has few or no financial assets.

• The total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct

The only damages incurred by the defendant to date are the compensatory damages awarded by the jury to the plaintiff in the amount of $45,733.

• Litigation expenses

■ Under Kansas law, litigation expenses are an additional factor that courts may consider in awarding punitive damages. *See Smith v. Printup*, 262 Kan. 587, 601, 938 P.2d 1261 (1997). At the February 5 hearing, counsel for the plaintiff told the court that fees and costs in prosecuting the case amounted to approximately $100,000 and that his client had paid approximately $38,000 of that bill. According to counsel, he agreed that his client need not pay him the remainder of the bill until they learned the outcome of the trial.

• Conclusion

■ In arriving at an amount of punitive damages sufficient to punish the defendant for its conduct and to deter it and others from similar conduct in the future, the court has considered the factors enumerated in K.S.A. 60–3702 as well as the litigation expenses the plaintiff incurred in prosecuting this action. The court has also considered the nature of the conduct which gave rise to punitive damage liability in light of all of the evidence presented at trial. The court believes that the sum of $50,000 is a sufficient award to accomplish the purposes of a punitive damage award.[12]

---

11. On March 11, 1997, Mr. Burne finally gave Safety Technologies the FDA certification numbers and Safety Technologies discovered that certification was rescinded.

12. At the February 5 hearing, the defendant argued that an award of punitive damages was limited by K.S.A. § 60–3702(e). According to section 60–3702(e), no award of punitive damages "shall exceed the lesser of: (1)

the annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded ... or (2) $5 million." The defendant's misconduct occurred in 1996 and 1997. The court interprets section 60–3702(e) as allowing the court to consider the highest annual gross income earned by Bio-

At the time of the defendant's misconduct, it was almost certain that Safety Technologies would suffer a financial loss if it purchased needle incineration units in the erroneous belief that they could be legally resold in the United States. Because Safety Technologies was created by a handful of individual entrepreneurs and investors for the sole purpose of reselling the units in the United States, the loss could be serious. The defendant was aware or should have been aware that its failure to disclose that the FDA rescinded certification risked putting Safety Technologies out of business and causing the individuals associated with Safety Technologies to suffer a potentially serious financial loss. Despite multiple requests for verification of FDA certification, the defendant chose not to disclose that the FDA had rescinded certification. The defendant, however, did not profit from its misconduct and it is no longer in business. Biotronix 2000 will not be deterred from future misconduct because it is no longer operating, and the ultimate failure of its business should deter others from similar misconduct more than would a large award of punitive damages. The jury awarded Safety Technologies $45,733 in damages. Combining the award of actual damages with an award of $50,000 in punitive damages amounts to an award of more than 75% of the defendants gross profit in 1997, the only year the defendant reported a profit. After considering all of the evidence presented at trial, the court concludes that the defendant's conduct deserves punishment, yet is not so egregious as to justify an award of punitive damages

much larger than the jury's award of actual damages.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for judgment as a matter of law (Doc. 46) is denied and that judgment be entered in favor for the plaintiff for punitive damages in the amount of $50,000.

**IT IS SO ORDERED** this—day of March, 2001.

tronix 2000 in 1996 and 1997. There is no logical reason why the legislature would have wanted to exclude consideration of the year in which the misconduct occurred. If the legislature had intended to exclude consideration of the year in which the misconduct occurred, the statute would likely read "for any of the

five years before the year in which the act for which such damages are awarded." The defendant's annual gross profit for 1997 was $123,626. An award of $50,000 is less than the defendant's gross profit for 1997 and, therefore, is not limited by section 60–3702(e).