1997 SD 25

Jo **LANDSTROM**, individually and as guardian ad litem for her minor daughter Katheryn E. Drenker, and Kara Dee Drenker, Plaintiffs and Appellees,

v.

Inez L. **SHAVER**, Special Administratrix of the Estate of J. Milton P. Shaver; Jack Devereaux; and Constance J. Drew, Defendants and Appellants,

and

Black Hills Jewelry Manufacturing Co., a South Dakota Corporation, Defendant and Appellee.

Nos. 19490–19492, 19495–19497.

Supreme Court of South Dakota.

Argued Sept. 10, 1996.

Decided March 12, 1997.

**2**

Terence R. Quinn & Michael P. Reynolds,
Quinn, Eiesland, Day & Barker, Belle
Fourche, and Gordon W. Netzorg, J. Nich-
olas McKeever, Jr., Susan Bernhardt of Net-
zorg & McKeever, Englewood, CO, for Ap-
pellees Landstrom and Drenker.

Michael L. Luce & Timothy M. Gebhart of
Davenport, Evans, Hurwitz & Smith, Sioux
Falls, and Richard S. Mandelson & Marjorie
N. Sloan of Baker & Hostetler, Denver, CO,
for Appellant Devereaux.

Mark V. Meierhenry of Danforth, Meier-
henry & Meierhenry, Sioux Falls, and Jean
M. Massa of Jensen and Massa, Winner, and
E.W. Hertz of Ulmer, Hertz & Bertsch,
Menno, for Appellant Drew.

John Simko & James E. Moore of Woods,
Fuller, Shultz & Smith, Sioux Falls, and John
Paul Martin of Peterson, Tews & Squires,
Minneapolis, MN, for Appellant Shaver.

James S. Nelson, Mark J. Connot of Gun-
derson, Palmer, Goodsell & Nelson, and Jo-
seph M. Butler, Patrick Duffy of Bangs,
McCullen, Butler, Foye and Simmons, Rapid
City, for Appellee BH Jewelry.

GILBERTSON, Justice.

## INTRODUCTION

[¶ 1.] This case involves both legal and
equitable claims asserted by Jo Landstrom
[hereinafter Landstrom], a minority share-
holder,[1] in Black Hills Jewelry Manufactur-
er, and Kara Dee Drenker, brought this action.
Landstrom transferred some of her stock in

1. Jo Landstrom, individually and as guardian ad
litem for her minor daughter Katheryn E. Drenk-

ing Company [hereinafter BHJMC]. Her suit is against the remaining shareholders in BHJMC, Milt Shaver [hereinafter Shaver],[2] Jack Devereaux [hereinafter Devereaux], and Constance Drew [hereinafter Drew]. The case was tried on an equitable claim of shareholder oppression and legal claims of breach of fiduciary duty, tortious interference with prospective economic advantage, negligent misrepresentation and negligence. The equitable and legal claims were tried simultaneously with a jury rendering a verdict for Landstrom on the legal claims and an advisory verdict in favor of Landstrom on the equitable claim. Thereafter the trial court entered findings of fact and conclusions of law in favor of Landstrom on the equitable claim consistent with the advisory verdict of the jury.

[¶ 2.] The jury found Shaver, Devereaux and Drew intentionally interfered with Landstrom's business relations and expectancies by failure to either sell the stock of all the shareholders or allow Landstrom to sell her stock. Damages were determined to be $10 million apportioned by the jury to be paid 40% by Shaver and 30% each by Devereaux and Drew. The jury found that Shaver breached his fiduciary duty by failing to disclose a veto provision in a 1987 buy-sell agreement. It awarded damages of $4 million. The jury also found that Shaver, Devereaux and Drew breached their fiduciary duty to Landstrom by refusing to properly direct BHJMC. It awarded $4 million in damages, apportioned 40% against Shaver, 30% against Devereaux, and 30% against Drew. The jury further found Shaver negligently misrepresented to Landstrom the 1987 revisions in the buy-sell agreement and awarded damages at $3 million. However this award was later determined by the trial court to be duplicative with the award of breach of fiduciary duty by Shaver and therefore was remitted. The jury found that Shaver, Devereaux and Drew were negligent by "failing to properly direct the company" but determined that no additional damages had been proved. Thus, after the post-trial proceedings, damages were awarded at $18 million on the legal claims.

[¶ 3.] The trial court further entered a judgment that appropriate relief on the equitable claim would be for Devereaux and Drew to purchase Landstrom's minority interest in BHJMC for $8.4 million. We affirm in part and reverse in part.

## FACTS

[¶ 4.] Ivan Landstrom founded BHJMC in 1944. Thereafter, he, along with others, owned and operated BHJMC as a partnership. Defendant Shaver was employed by BHJMC as manager but during that period of time did not have an ownership interest.

[¶ 5.] On March 17, 1968, Ivan Landstrom, along with his wife and six Rapid City High School cheerleaders, were killed in a plane crash. One of the cheerleaders was the Landstroms' youngest daughter. Landstroms were survived by two daughters, Jo Landstrom and Constance Drew. Jo Landstrom was twenty years old at the time of her parents' deaths. Constance's age at that time was not established by the record.

[¶ 6.] Upon the death of Ivan Landstrom and his wife, their interest in BHJMC passed to a trust with Jo Landstrom and Drew as beneficiaries. The value of this stock was $160,000 at the date of Ivan Landstrom's death. The day after Ivan's death, Shaver met with the trust representative indicating that if Shaver were to continue employment with BHJMC, Shaver wanted an ownership interest in the company. After the trustee informed Landstrom and Drew of Shaver's position, Shaver's demand was met by the trustee.

[¶ 7.] Following the death of the Ivan Landstroms, Shaver and his wife become close friends of Jo Landstrom and Drew. Jo Landstrom would later describe them as her surrogate parents. However this relationship was not to last.

Black Hills Jewelry Manufacturing Co. to the other plaintiffs. However Landstrom is the moving force behind this litigation and all references to a plaintiff will be to Landstrom.

2. Shaver died on November 29, 1992. Shaver's widow and special administratrix of his estate, Inez Shaver, was substituted as a party to this action.

[¶ 8.] After incorporation of BHJMC in 1977, the stock interests were allocated. Shaver held a 17.356% ownership in BHJMC. In 1977 the trust was dissolved with Landstrom and Drew each acquiring a 33.058% interest in BHJMC. The remaining interest of 16.529% was held by Defendant Devereaux which he received from his father who had been one of the original owners.

[¶ 9.] In 1977 the shareholders of BHJMC entered into a buy-sell agreement. This agreement provided that Shaver would not be permitted to sell his stock to outside third parties during his lifetime and that BHJMC would purchase Shaver's stock upon his death at a price set by a formula contained in that agreement. The agreement also required that any shareholder, other than Shaver, who desired to sell his or her stock, first offer that stock to BHJMC and then to the other shareholders at a price to be determined by the same formula. As per the agreement, only after BHJMC and other shareholders refused to purchase the stock, could it be sold to outside third parties.

[¶ 10.] This agreement was amended in 1987. The amendment allowed Shaver the right to veto a sale of stock by any other shareholder. According to attorney notes this was for the purpose of allowing Shaver to protect his interests by requiring "Milt's (Shaver's) approval or pay Milt off." The trial court found as fact that although Landstrom signed the 1987 agreement, she did not know that the Shaver veto provision had been placed in the final draft and that she was misled by Shaver on this point.

[¶ 11.] Beginning in 1978 after the dissolution of the Landstrom Trust, the Board of Directors consisted of Shaver, Landstrom, Devereaux and Drew. Shaver, who had been BHJMC President since its incorporation in 1977, continued in that capacity until 1984 when he retired from that position. However, the trial court found Shaver continued to exercise significant day-to-day influence over management of BHJMC until Shaver's death in 1992. Shaver was also Chairman of the Board of Directors until 1984. Landstrom held the post of Chairperson from 1984 until she voluntarily resigned in 1989.

[¶ 12.] By 1984 there had developed a strong difference in the business philosophies among the Directors. Landstrom felt BHJMC was drifting with lack of leadership from the Directors and lack of planning and fiscal accountability. She provided a series of reports to the other Directors in support of her arguments. Landstrom was troubled that BHJMC did not prepare a proposed budget for the upcoming year and was not attempting to determine and anticipate future demand for its various jewelry creations.

[¶ 13.] Shaver, Devereaux and Drew opposed Landstrom's suggestions for changes in company direction. They operated under the philosophy, described by Devereaux, that "if it ain't broke, don't fix it." They felt that BHJMC had prospered by a Board review of prior years' profit-and-loss statements. They termed this "historical budgeting." They viewed Landstrom's various proposals for future planning and budgeting as "creative fantasy trips."

[¶ 14.] During this period BHJMC initially experienced phenomenal growth and profits which Shaver, Devereaux and Drew pointed to as supporting their traditionalist business philosophies. At the time of Ivan Landstrom's death in 1968, BHJMC employed 50 people. By 1990, the number of employees at the company had increased to approximately 400 people. Its annual sales increased from $24,000 to $37,000,000 by 1990, which constituted over a 50% share of the Black Hills gold jewelry market. Its stock was valued at $71 million. Its profits since 1989 have been:

| | |
|---|---|
| FYE 6/30 1989 [3] | $ 6,983,392 |
| FYE 6/30 1990 | 10,776,118 |
| FYE 6/30 1991 | 7,618,949 |
| FYE 6/30 1992 | 6,889,400 |
| FYE 6/30 1993 | 14,773,948 |
| FYE 6/30 1994 | (1,691,870) |
| FYE 6/30 1995 | (650,045) |

[¶ 15.] From 1984 to 1993 the shareholders received an average annual return on their investment of 39%.[4] However, as is indicat-

---

3. "FYE" refers to fiscal year ending.

4. As an example, Landstrom received more than $1,000,000 in dividends in 1985; $1,800,000 in 1986; $2,299,000 in 1987; $2,575,000 in 1988

ed by the 1994 and 1995 figures, BHJMC's fortunes declined rapidly at that point. The 50% market share fell to 27%. The value of the company stock fell from $71 million to $21 million.

[¶ 16.] By the late 1980's, the once harmonious Directors' meetings now were sharply split by differences. Although Landstrom attended meetings and presided as Chairperson, often with her personal attorney in attendance, the other three Directors would refuse to second any of her motions when they disagreed with them. In frustration, Landstrom voluntarily resigned as Chairperson and from the Board on September 20, 1989. She used her shares to elect a Director chosen by her to act in her place.

[¶ 17.] In January 1989, Landstrom orally informed the other Directors she was considering selling her shares in BHJMC because of the Directors' disputes. The other Directors responded that perhaps they should also consider selling their shares thus putting the entire company up for sale. Landstrom proceeded with plans to sell BHJMC, the terms of which were later found unacceptable to the other Directors.

[¶ 18.] In August of 1989, Shaver gave Landstrom a copy of a letter from Shaver's attorney to Shaver in which the attorney recommended Shaver should obtain more information about a potential purchaser of Landstrom's stock before Shaver decided whether to exercise his veto under the 1987 amendment to the buy-sell agreement. Shaver repeated to Landstrom that Shaver was also considering a sale of his stock.

[¶ 19.] Landstrom never complied with the requirements of the 1987 amendments. She never informed the other Directors in writing of her desire to sell her stock and she basically ignored the agreement. At one point

she demanded $25 million for her stock despite the fact that its price, pursuant to the 1987 amendment, would be established by a set formula.

[¶ 20.] Ultimately Shaver, Devereaux and Drew did not sell their stock. Neither did Landstrom. Instead she filed this action on December 14, 1990. Shaver would die in November of 1992. At that point, BHJMC purchased Shaver's shares pursuant to the 1987 agreement. Thereafter Landstrom would hold 40% of the stock, Drew would hold 40% and Devereaux would hold 20%.

[¶ 21.] In ruling on the equitable cause of action, the trial court found that "the Company has declined in value from $71 million to $21 million as a result of misdirection by Shaver, Devereaux and Drew." The verdict and special interrogatories answered by the jury earlier indicated it found the facts to be the same.

## LEGAL ANALYSIS

[¶ 22.] **1. Did the trial court improperly join the legal and equitable claims?**

■ [¶ 23.] Defendants filed a pretrial motion to sever the equitable and legal issues claiming that consolidation would result in the introduction of prejudicial evidence. The trial court denied the motion and the legal and equitable actions were tried simultaneously.[5]

[¶ 24.] Bifurcation of claims is addressed by SDCL 15–6–42(b). This statute allows the trial court the discretion to order separate trials in proper circumstances "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy[.]"[6] *Sybesma v. Sybesma*, 534 N.W.2d 355, 360

and $2,353,114 in 1989. For 1990 through 1992 she received $5,645,291.

5. In the equitable trial of shareholder oppression, the jury acted in an advisory capacity only. SDCL 15–6–39(c) authorizes the use of an advisory jury in "all actions not triable of right by a jury...." See *Nizielski v. Tvinnereim*, 453 N.W.2d 831 (S.D.1990).

6. SDCL 15–6–42(b) provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the state or federal Constitution or as given by a statute.

(S.D.1995); *Fullmer v. State Farm Ins., Co.,* 498 N.W.2d 357, 360 (S.D.1993).

[¶ 25.] Defendants argue that failure to bifurcate allowed the jury to be prejudiced by evidence which would have not been admissible had the bifurcation been allowed. Defendants made a motion to prohibit all evidence of the relationships between the parties which occurred prior to the six-year statute of limitations provided by SDCL 15–2–13. Shaver complains that the joint trial allowed Landstrom to particularly attack his actions from 1968 into the 1970's which were highly prejudicial to him and not admissible in the legal causes of action. All Defendants argue that while these historical facts were relevant to the equitable claim of oppression as it focuses on the entire history of the participants' relationship, *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E.2d 551, 563 (1983), there is no evidentiary basis for their admission concerning the legal claims.[7]

[¶ 26.] Drew argues Shaver's actions were more culpable than hers or Devereaux's and thus she and Devereaux were prejudiced through "guilt by association" with Shaver's activities on how he acquired his stock in 1968 and the 1987 veto provision being slipped into the buy-sell agreement.

[¶ 27.] Shaver further argues the legal and equitable issues did not involve common issues of fact. This is clearly incorrect. The breach of fiduciary duty to properly direct the corporation and the tortious interference claims significantly overlap common facts with the equitable oppression claim. At trial, counsel for BHJMC commented, and all Defendants agreed, that "[a]ll of these claims rest upon the same basic alleged misconduct." Judicial economy is a reason to join claims where such joinder will not prejudice the parties. Maintaining separate trials on the legal and equitable issues in this case, where many of the facts overlap the two claims and in which the same evidence would be required to be introduced in the separate trials, would be particularly nonconducive to expedition and economy. The single trial

from which this appeal arose consumed five weeks, involved numerous witnesses, and thousands of pages of documents.

[¶ 28.] Thus, we must determine under SDCL 15–6–42(b) whether the trial court abused its discretion when it refused to separate the legal and equitable trials which purportedly prejudiced the Defendants. The "mere possibility of some prejudice does not justify separate trials where such prejudice is not substantial and there are strong countervailing considerations of economy." *Tri–R Systems, Ltd. v. Friedman & Son, Inc.,* 94 F.R.D. 726, 728 (D.Colo.1982). The Defendants as moving parties bear the burden of showing such prejudice. *Stratagem Dev. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535, 551 (S.D.N.Y.1994); *cf. State v. Sabers,* 442 N.W.2d 259, 263 (S.D.1989) (severance of criminal counts).

[¶ 29.] The Defendants fail to make a specific showing of prejudice other than their general claims listed above. Drew claims she became a victim of "guilt by association" when the trial court permitted the jury to hear testimony regarding Shaver's questionable conduct concerning the manner in which he acquired his stock in 1968. However, Drew, as Landstrom's sister, was subject to the same treatment by Shaver as was Landstrom and could rightly claim she was equally a victim of Shaver's stock acquisition activities.

[¶ 30.] Devereaux's complaint about the same treatment cannot be so easily reconciled. The historical background of the Shaver acquisition of his stock at the time of the deaths of the Ivan Landstrom family could have the potential to prejudice a jury from the impartial sifting of the evidence to arrive at its factual determinations on the individual causes of action against the individual Defendants. While the facts may be properly admitted under an abuse of discretion standard, that is not granting a license to make any and all use of them to tilt the even playing field which a court of justice

---

7. Whether the evidence which occurred prior to the running of the statute of limitations was admissible under a prior bad acts theory pursuant to SDCL 19–12–5, is not before this Court.

SDCL 19–12–5 clearly applies to civil as well as criminal cases. *See, e.g., Sander v. Geib, Elston, Frost Prof'l Ass'n,* 506 N.W.2d 107, 116 (S.D. 1993).

seeks to provide for the resolution of disputes.

[¶ 31.] To her credit, after the trial court allowed admissibility of the evidence concerning the circumstances surrounding Shaver's acquisition of this BHJMC stock, Landstrom did not seek to abuse this evidence. In her opening statement while making a brief reference to the stock acquisition, Landstrom told the jury that this case was not about how Shaver acquired this stock, but rather about oppression. In a closing argument that transcribes to sixty pages, Landstrom spent but one paragraph on the Shaver stock acquisition matter and then only for purposes of beginning the story of the business relationship between Landstrom and Shaver.

[¶ 32.] The care with which the jury understood its duties as evidenced by the special verdict form shows that the jury properly considered the culpability of each individual Defendant on each cause of action and did not lump all Defendants or all causes of action together. In fact on the cause of action of negligent direction of BHJMC, the jury awarded no damages against the Defendants although finding in favor of Landstrom on the merits.

[¶ 33.] Clearly the outcome of the equitable cause of action could not have been prejudiced as it was ultimately decided by the trial court which, while agreeing with the jury's advisory verdict, entered seventy-two pages of findings of fact and conclusions of law prior to doing so.

[¶ 34.] We emphasize that consolidation of causes of action in cases such as this must be carefully considered by the trial court. Prejudice could well result from facts which are totally irrelevant to a given cause of action or a party.[8] Here Landstrom's evidence of her claimed victimization by Shaver in the manner surrounding her parents' deaths and how Shaver acquired his stock does give us some cause for concern. This appeal presents a close case and we do not recommend this manner of trying claims to trial courts with this type of fact situation in the future.

However, given the totality of the factual circumstances and this Court's disposition of the legal causes of action, we find the trial court did not abuse its discretion in the joint manner in which it tried the causes of action and therefore, we affirm on this issue.

[¶ 35.] **2. Did the trial court err in determining that Landstrom had been oppressed?**

[¶ 36.] The trial court, in its findings of fact and conclusions of law, and the jury, in its advisory verdict, found that the Defendants had oppressed Landstrom. As equitable relief, the trial court ordered Devereaux and Drew, as the remaining shareholders, to purchase Landstrom's stock in BHJMC for $8.4 million. Devereaux and Drew appeal. Landstrom, apparently satisfied with the outcome, did not file a cross appeal on this issue.

[¶ 37.] It is settled law that we review a trial court's findings of fact under the clearly erroneous standard. *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995) (citing *Cordell v. Codington County*, 526 N.W.2d 115, 116 (S.D. 1994)). Under this standard, we will not disturb the court's findings unless we are firmly and definitely convinced, after a review of the entire evidence, a mistake has been made. *Id.* We review a trial court's conclusions of law under a de novo standard. *Id.* Under a de novo review, we give no deference to the trial court's conclusions of law. *Id.* Whether conduct is oppressive is a legal conclusion. *Robblee v. Robblee*, 68 Wash.App. 69, 841 P.2d 1289, 1293 (1992); *Davis v. Sheerin*, 754 S.W.2d 375, 380–81 (Tex.App.1988).

[¶ 38.] South Dakota has adopted the Model Business Corporation Act. SDCL 47–7–34 allows a trial court to grant relief in cases brought by a shareholder alleging oppression. The Code does not define what constitutes oppression. Other courts have defined oppression in the context of: (1) reasonable expectations of the minority shareholder or (2) as burdensome, harsh and wrongful conduct by the majority shareholders. *Gimpel*

---

8. SDCL 15–6–42(a) requires that the claims involve common questions of law or fact before they may be joined under one action. It is not an abuse of the trial court's discretion to deny motions to join claims that do not meet the statutory requirements. *Case v. Murdock, 488 N.W.2d 885, 892 (S.D.1992).*

*v. Bolstein,* 125 Misc.2d 45, 477 N.Y.S.2d 1014, 1018 (Sup.Ct.1984). The New York Court of Appeals has set out the following standard:

> Defining oppressive conduct as distinct from illegality in the present context has been considered in other forums. The question has been resolved by considering oppressive actions to refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise.
>
> A shareholder who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment.
>
> A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression.

*In re Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173, 1179 (1984) (internal citations and text omitted). The New York standard has been cited with approval by other courts addressing cases involving oppression of minority shareholders. *See Stefano v. Coppock,* 705 P.2d 443, 446 n. 3 (Alaska 1985); *Smith v. Leonard,* 317 Ark. 182, 876 S.W.2d 266, 272 (1994); *Gee v. Blue Stone Heights Hunting Cl.,* 145 Pa.Cmwlth. 658, 604 A.2d 1141, 1145 (1992) (noting the New York Court of Appeals' experience with oppression cases and adopting its standard); *Balvik v. Sylvester,* 411 N.W.2d 383, 387 (N.D.1987). *See also* Ferdinand S. Tinio, Annotation, *What Amounts to "Oppressive" Conduct Under Statute Authorizing Dissolution of Corporation at Suit of Minority Stockholders,* 56 A.L.R.3d 358 (1974 & Supp 1996).

[¶ 39.] Reasonable expectations have been described as:

> Mere disappointment in the results of a venture is not sufficient. Rather, the statutory protection is more dramatic, and 'oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the [minority shareholder's] decision to join the venture.'

*Matter of Wiedy's Furniture Clearance Center,* 108 A.D.2d 81, 487 N.Y.S.2d 901, 903 (1985). As noted above, disappointment is not necessarily sufficient to equal oppression. The reasonable expectations are to be analyzed in light of the entire history of the parties' relationship, and include expectations such as participation in management of corporate affairs. *Meiselman,* 307 S.E.2d at 560–63. It must be emphasized however, that a minority shareholder's reasonable expectations must be balanced against a corporation's ability to exercise its business judgment and run its business efficiently. *Muellenberg v. Bikon Corp.,* 143 N.J. 168, 669 A.2d 1382, 1387 (1996). Herein, the trial court granted Landstrom relief based mainly on the application of the reasonable expectations test but held it would have ruled the same way under the alternative "burdensome, harsh and wrongful" test. *Gimpel,* 477 N.Y.S.2d at 1018.

[¶ 40.] Defendants launch a four-pronged attack on the trial court's equitable award to Landstrom:

(1) SDCL 47–7–34 does not authorize the equitable relief granted Landstrom;

(2) There is insufficient evidence to find oppression to justify equitable relief;

(3) According to Devereaux and Drew, if there is wrongdoing, it was done by Shaver; and

(4) Landstrom is not entitled to equitable relief because of her "unclean hands."

[¶ 41.] Defendants initially argue that SDCL 47–7–34 does not authorize the equitable relief granted by the trial court. Defen-

dants state that the plain language of the statute only allows the trial court to liquidate the assets of the corporation in cases of oppression and not to order the majority shareholders to purchase the minority's shares.[9]   Other courts in deciding cases brought under similar statutes have held that a trial court has discretion, within its broad powers of equity, to create an appropriate remedy based on the evidence presented. *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274 (Alaska 1980); *Sauer v. Moffitt*, 363 N.W.2d 269, 274–75 (Iowa App.1984) (citing *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387, 395–96 (1973)); *Balvik*, 411 N.W.2d at 388; *McCauley v. Tom McCauley & Son, Inc.*, 104 N.M. 523, 724 P.2d 232 (N.M.App.1986).  This may include entry of an order requiring the wrongdoers to buy the stock of the complaining shareholder.  *Balvik*, 411 N.W.2d at 388–89,[10]  *Sauer*, 363 N.W.2d at 274–75.  The statute does not actually mandate liquidation in cases of oppression but rather provides that the court has this ultimate power to liquidate.  It makes little sense to leave the trial courts with two draconian options of helplessly dismissing outright a proven cause of action or ordering the dissolution of a corporation of the size and impressive record of BHJMC.

[¶ 42.] Second, the Defendants argue that there is insufficient evidence to find oppression to justify equitable relief.  Oppression is based on the totality of factual circumstances and is not relegated to a bright-line rule or implementation of a checklist.  While a single act may not amount to oppression, under the totality of all relevant circumstances of the case, oppression may be found to exist. *See River Management Corp. v. Lodge*, 829 P.2d 398, 405 (Colo.Ct.App.1991); *cf. Vermilyea v. BDL Enter., Inc.*, 462 N.W.2d 885, 888 (S.D.1990).

[¶ 43.] The trial court found that Landstrom expected to have meaningful participation in the direction of BHJMC.  Her expectations were based upon Landstrom's status as a substantial shareholder in a closely-held company, her position as a Director, her election as Chairperson of the Board, her personal relationship with co-owners Shaver, Devereaux and Drew over the years, and her

**9.**  SDCL 47–7–34 provides in part:

> The circuit court shall have full power to liquidate the assets and business of a corporation in an action by a shareholder when it is established:
>
> .    .    .    .    .
>
> (2) that the acts of the directors or those in control of the corporation are ... oppressive[.]

**10.**  The court in *Balvik* cited the following equitable options available to a trial court in dealing with an oppression situation under a statute similar to SDCL 47–7–34:

> (a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
> (b) the appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or 'oppressive' conduct ceases;
> (c) The appointment of a 'special fiscal agent' to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
> (d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or 'special fiscal agent';
> (e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;
> (f) The issuance of an injunction to prohibit continuing acts of 'oppressive' conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;
> (g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;
> (h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;
> (i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;
> (j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of 'oppressive' conduct by the majority in control of the corporation.
>
> (citing *Baker*, 507 P.2d at 395–96).

sense of obligation to protect and preserve the family legacy. However, the fact that she held these positions, while perhaps raising her subjective expectancies, does not correspond to an objective right to be allowed to run the company.

[¶ 44.] Defendants argue that oppression cases are limited in non-fraud situations to where the minority shareholder is in a "freeze-out" or "squeeze-out" situation. In these types of settings, courts have observed that,

> [t]he squeezers (those who employ the freeze-out technique) may refuse to declare dividends; they may drain off the corporation's earnings in the form of exorbitant salaries, and bonuses to the majority shareholder-officers and perhaps to their relatives ...; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders.

*Sugarman v. Sugarman,* 797 F.2d 3, 7 (1stCir.1986). While freeze-out or squeeze-out situations may be typical of oppression cases, they are not exclusive.

[¶ 45.] Although the trial court entered six pages of conclusions of law on the issue of oppression, significantly it did not find in this case that there were attempts at a squeeze-out or a freeze-out by the Defendants. The trial court held the following conduct by Shaver, Drew and Devereaux evidenced oppression of Landstrom:

> Defendants' respective efforts in directing the Company, failure to pay adequate attention to safety concerns, deception in obtaining Landstrom's signature to the 1987 Revision, refusal to deal on a good faith basis with her attempts to sell her

stock, disdain for her desire to treat employees decently, animosity toward her that they have exhibited during this litigation, and continued actions at annual shareholder meetings designed to prevent her from meaningfully participating in the Company, all constitute facts from which this Court concludes Shaver, Drew and Devereaux oppressed Plaintiffs. This conclusion is consistent with the jury's advisory verdict.

Determining whether conduct arises to the level of oppression depends upon the individual circumstances in any given case. *Smith,* 317 Ark. 182, 876 S.W.2d 266; *Kemp,* 484 N.Y.S.2d 799, 473 N.E.2d at 1179.

[¶ 46] Typically, relief has been granted in non-fraud oppression cases where the majority has engaged in a freeze-out or squeeze-out conduct. *See e.g. Balvik, supra.* Landstrom has not established even one of the common oppressive devices use to squeeze-out/freeze-out or otherwise destroy the reasonable objective expectations of a minority shareholder. Perhaps recognizing this, she concedes in her brief that she "has never contended this was a 'freeze-out' or 'squeeze-out' case." Rather she argues her case consists of

> evidence established and the trial court found continuing efforts to block, frustrate, and belittle Landstrom's efforts to properly run the company, and then the aggravation of that course of oppression by thwarting Landstrom's efforts to escape the oppression by selling her shares. This conduct willfully took advantage of the majority's ability to dominate Landstrom in her attempts to participate in the Company.

(Landstrom brief, p. 65). It is difficult, if not impossible, to find a case which categorizes similar acts as oppression.[11]

---

11. The cases cited by Landstrom in support of her oppression claim are not factually similar to the present case. *See, e.g., River Management Corp.,* 829 P.2d 398 (finding oppression where there were only five board of director's meetings, which the CEO never attended, and only one shareholders' meeting in four years; no votes ever taken on prospective projects; decisions which overran the budget and generated no income were made without authority from the board of directors); *Gidwitz v. Lanzit Corrugated Box Co.,* 20 Ill.2d 208, 170 N.E.2d 131 (1960) (unilateral management of corporation in the absence of majority stock support); *Hager–Freeman v. Spircoff,* 229 Ill.App.3d 262, 171 Ill.Dec. 1, 593 N.E.2d 821 (1992) (no meetings of board of directors or shareholders ever held; forged signatures in minutes; dates on stock certificates altered; checkbooks hidden from shareholder; changed locks; no financial information released to complaining shareholder; no dividends or profit distribution; shareholder who invested her life savings told that she would never see a

[¶ 47.] It should be noted that while Landstrom has always been a minority shareholder, there has never been a shareholder who would qualify as a majority shareholder. Landstrom's difficulties stem from the fact that she was unable to get a single other minority shareholder to agree with her views. In fact Landstrom along with Drew have been the largest single shareholders in BHJMC since it was incorporated in 1977.

[¶ 48.] Landstrom always received her proportionate share of dividends which totaled in excess of $20 million by 1994. She was never deprived of corporate offices as she was elected Chairperson of BHJMC upon Shaver's retirement in 1984. Landstrom was notified and allowed to attend all Directors meetings where she presided as Chairperson until her voluntary resignation from the Chair and the Board. At her option, her attorney was allowed to also attend and advise her during the course of the meetings. When she voluntarily resigned, she was allowed to pick her successor on the Board. In 1993 she elected two directors, one of whom became the Chair.

[¶ 49.] Landstrom was employed by BHJMC from time to time as a consultant and was always paid when she requested it. She was at no time forced to sell her shares let alone at less than their value. When she decided she wanted to sell her shares, she admitted she failed to follow the buy-sell agreement she had previously signed, and instead demanded $25 million for her shares which was in excess of the formula of the agreement which should have controlled.[12] In fact, when the Shaver shares were purchased pursuant to the buy-sell agreement after his death, Landstrom acquired her pro rata share increasing her holdings from 33% of the corporate stock to 40%.

[¶ 50.] The balance of her complaints center around the internal operation of BHJMC. As one witness put it, BHJMC was successful almost in spite of itself. It is not as if the Defendants abandoned prior practice of having budgets, management accountability and proper planning. The ideas Landstrom championed were new and radical to this company, even if they were common practice in most corporations. They were also proposed against a financial background of impressive profits and growth under the existing system. For example, the evidence showed that when a finance and accounting department was created in 1993 or 1994, it was the first in the company's lengthy history. The Defendants' reluctance to change may have, in hindsight, been ill-advised and even financially disastrous but it does not constitute oppression. It is not considered oppression when the controlling shareholders seek to control management and the affairs of their corporation. *Muellenberg*, 669 A.2d at 1389.

[¶ 51.] Finally, there is no evidence that the Defendants violated any laws of this state, violated the by-laws of the corporation or engaged in any financial self-dealing conduct to the exclusion of Landstrom.

[¶ 52.] We conclude that under either the reasonable expectations test or the burdensome, harsh and wrongful conduct test, as a matter of law, Landstrom has failed to establish oppression. All she has established is that she was outvoted and subjectively disap-

return on that investment); *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 645 P.2d 929 (1982) (never declared dividends; rented corporate land for far less than reasonable rental value); *In re Topper*, 107 Misc.2d 25, 433 N.Y.S.2d 359 (Sup.Ct.1980) (no dividends paid out; shareholder discharged from his employment, and his salary terminated; also removed as an officer and as a co-signatory on the corporate bank account; locks changed on offices to exclude him); *Meiselman, supra* (holding that trial court erred in analyzing case under an oppression standard when the statute dictated inquiry into whether certain "rights and interests" are in need of protection); *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990) (misapplication and waste of corporate funds,

including a failure to pay adequate dividends). Perhaps recognizing this, Landstrom is reduced to arguing without supporting authority that, "(b)ecause each case is unique, however, reference to those cases cannot determine, as a matter of law, that no oppression occurred in this case. That this case is not identical to another does not mean there was no oppression; it must be weighed on its own merit." (Landstrom brief p 62).

**12.** In commenting on this formula, the trial court noted that her shares would have been worth $18,712,943.60 or 40% of the $46,782,384 value of BHJMC as of August 1, 1995.

pointed with corporate management. There are none of the traditional hallmarks of action by majority shareholders which have been held to constitute oppression. We are unwilling to elevate subjective minority shareholder dissatisfaction to constitute oppression.

[¶ 53.] **3. Did the trial court err in allowing Landstrom to proceed directly against the individual shareholders rather than requiring a derivative action?**

[¶ 54.] The majority rule is that an action to redress injuries to a corporation cannot be maintained by a shareholder on an individual basis but must be brought derivatively. *Crocker v. Fed. Deposit Ins. Corp.,* 826 F.2d 347, 349 (5thCir.1987); *cert. denied,* 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 235 (1988); *Meyerson v. Coopers & Lybrand,* 233 Neb. 758, 448 N.W.2d 129, 133 (1989); *Engstrand v. West Des Moines State Bank,* 516 N.W.2d 797, 799 (Iowa 1994). The generally recognized rule for determining whether a cause of action belongs to the corporation, rather than to an individual shareholder, is to ascertain whether "the injury to each stockholder is of the same character." *Arent v. Distribution Sciences, Inc.* 975 F.2d 1370, 1372 (8thCir.1992).[13] In other words, under the general rule, for a shareholder to maintain an individual action, the shareholder must establish a "special injury" which is separate and distinct from that of other shareholders. *Cowin v. Bresler,* 741 F.2d 410, 415 (D.C.Cir.1984); *Engstrand,* 516 N.W.2d at 799; *Meyerson,* 448 N.W.2d at 133. Diminution in the value of stock is a loss that is sustained by all shareholders and thus subject to the derivative action require-

ment. *Arent,* 975 F.2d at 1373; *Meyerson,* 448 N.W.2d at 134.

[¶ 55.] This Court has followed this general rule on two occasions. In *Glover v. Manila Gold Mine & Mill. Co.,* 19 S.D. 559, 104 N.W. 261 (S.D.1905), we held the plaintiff's claim of an individual judgment was not appropriate as the plaintiff had alleged the damages accrued to the corporation and not individually to himself:

The right of stockholders to bring such an action is clearly sustained by the decision of this court in the case of *Loftus v. Farmers' Shipping Ass'n,* 8 S.D. 201, 65 N.W. 1076, in which this court held that stockholders of a corporation may bring an action on behalf of the corporation against its directors, who by their fraudulent management and conduct of the business of the corporation are fraudulently and intentionally so conducting the business of the same as to depreciate the value of the stockholders' interest therein, and in effect to deprive them of their property.

104 N.W. at 264, 19 S.D. at 570.

[¶ 56.] In *Jepsen v. Peterson,* 69 S.D. 388, 10 N.W.2d 749, 750 (S.D.1943), we again recognized the derivative rule with a limited exception. This exception provides that "[i]f a corporation refuses to prosecute an action in its favor, equity to prevent a failure of justice disregards the corporate entity and permits suit to be brought and maintained by a stockholder to protect rights beneficially belonging to him. The right exists because of special injury to him." *Id.* 10 N.W.2d at 750. The burden of proof would fall upon the shareholder to establish that such "special injury" did indeed exist. *Id.* 69 S.D. at 392, 10 N.W.2d at 751.[14]

---

**13.** In *Thomas v. Dickson,* 250 Ga. 772, 301 S.E.2d 49, 51 (1983) the court stated there were four reasons to justify this general rule: (1) it prevents a multiplicity of lawsuits by shareholders; (2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; (3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and (4) it adequately compensates the injured shareholder by increasing the value of the shareholder's shares.

**14.** Such a special injury was found by the court in the case of *Backus v. Finkelstein,* 23 F.2d 357 (D.C.MN 1927). Applying South Dakota law, the court concluded that a special injury authorized a direct action rather than a derivative one. The trial court found such special injury to the plaintiff minority shareholders on the basis of the majority shareholders' improperly inducing the minority shareholders to sell their stock to the majority shareholders at a less than fair price and improperly denying them dividends.

[¶ 57.] A minority of courts now permit that when a minority shareholder in a close corporation [15] brings claims alleging wrongdoing by the majority shareholders, the claims are not automatically held to be brought derivatively. *Johnson v. Gilbert,* 127 Ariz. 410, 621 P.2d 916, 918 (Ariz.App. 1980); *Thomas,* 301 S.E.2d at 51; *Steelman v. Mallory,* 110 Idaho 510, 716 P.2d 1282, 1285 (1986); *Barth v. Barth,* 659 N.E.2d 559, 562 (Ind.1995); *Richards v. Bryan,* 19 Kan. App.2d 950, 879 P.2d 638, 647–48 (1994); *Horizon House–Microwave, Inc. v. Bazzy,* 21 Mass.App.Ct. 190, 486 N.E.2d 70, 74 (1985); *Schumacher v. Schumacher,* 469 N.W.2d 793, 798–99 (N.D.1991).

> The derivative-direct distinction makes little sense when the only interested parties are two individuals or sets of shareholders, one who is in control and the other who is not. In this context, the debate over derivative status can become 'purely technical.' There is no practical need to insist on derivative suits when there is little likelihood of a multiplicity of suits or harm to creditors. Any recovery in a derivative suit would return funds to the control of the defendant, rather than to the injured party. In some of these traditional derivative claims brought as direct actions, courts focus on the disproportionate impact of the challenged corporate actions. For example, when assets are alleged to be sold to insiders at inadequate prices, only the minority shareholders bear the loss and the majority receives any benefits in their capacity as purchasers.

O'Neal & Thompson, O'Neal's Close Corporations, § 8.16 at 103 (3d ed 1994).

[¶ 58.] The trial court followed *Barth's* adoption of the American Law Institute's proposed rule for determining when a shareholder in a closely-held corporation may proceed by direct, rather than derivative action.

> In the case of a closely-held corporation, the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Barth,* 659 N.E.2d at 562 (quoting ALI, *Principles of Corporate Governance* § 701(d)).

[¶ 59.] Applying the above criteria to the facts in this case, the trial court found: (1) that requiring a derivative action might result in a distribution to BHJMC and the shareholders which was inequitable as Landstrom is suing the only other shareholders who would then participate in the majority of the relief should Landstrom prevail; (2) that allowing a direct action against the Defendant shareholders would not expose BHJMC to multiple suits, but would rather tend to reduce the potential for multiple litigation; and (3) that there was no indication that a direct action would materially prejudice any interests of any creditors or inhibit BHJMC's ability to continue doing business. An additional consideration recognized by the trial court was that there would be an equitable cause of action by Landstrom in her personal capacity against the Defendants for oppression.

[¶ 60.] Defendants attack the ALI minority rule as posing great potential for abuse of a corporation and its majority shareholders by a disgruntled minority shareholder. Their point is not without merit. A minority shareholder in a close corporation may have different goals than a majority. A dispute over maximization of short-term profits as against

---

15. A close corporation is one in which the management and ownership are "substantially identical to the extent that it is unrealistic to believe that the judgment of the directors will be independent of that of the stockholders." *Thisted v. Tower Management, Corp.,* 147 Mont. 1, 409 P.2d 813, 820 (1966). Typical attributes of a close corporation are that: (1) the shareholders are few in number, often two or three; (2) the shareholders usually live in the same geographical area, know each other, and are well acquainted with each others' skills in regards to the corporation; (3) all or most of the shareholders are active in the business usually serving as directors or officers or as management; and (4) there is no established market for the corporate stock. *Balvik,* at 383.

the long-term financial health and growth of the corporation is an obvious example.[16] Here, there was evidence presented in the record of this case that BHJMC has suffered financially because of the effect this litigation has had upon it. Thus, we must weigh the interests of the corporation and its majority and minority shareholders, creditors and its employees in determining what is an appropriate balance of each parties' rights.

[¶ 61.] We have given careful consideration to the case law cited by both Landstrom and the Defendants in support of their opposing positions on this issue. We conclude that given our case law and that of other jurisdictions, it is the better course to continue to follow the majority rule and not adopt the ALI proposed rule. The basis for this rationale is well set forth by *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 384 (7thCir.1990) *cert. denied, 500 U.S. 952, 111 S.Ct. 2257, 114 L.Ed.2d 710 (1991)*, where the court criticized the concept behind the ALI rule finding the rule was an ill-advised attempt at removing the distinctions of the structure of a close corporation and that of a partnership:

> The premise of this extension may be questioned. Corporations are *not* partnerships. Whether to incorporate entails a choice of many formalities. Commercial rules should be predictable; this objective is best served by treating corporations as what they are, allowing the investors and other participants to vary the rule by contract if they think deviations are warranted. So it is understandable that not all states have joined the [ALI] parade. (emphasis original).

[¶ 62.] Landstrom seeks the best of both business entities: limited liability provided by a corporate structure and direct compensation for corporate losses. "That cushy position is not one the law affords. Investors who created the corporate form cannot rend the veil they wove." *Kagan v. Edison Bros.*

*Stores, Inc.*, 907 F.2d 690, 693 (7thCir.1990). Recovery by the corporation ensures that all of the corporate participants-stockholders, trade creditors, employees and others will recover according to their contractual and statutory obligations. *Kagan*, 907 F.2d at 692. We have consistently held that a corporation is an entity separate and distinct from its shareholders. *Kansas Gas & Elec. Co. v. Ross*, 521 N.W.2d 107, 111 (S.D.1994).

[¶ 63.] The ALI rule does not include all relevant considerations concerning the type of dispute now before us. A significant defect is that it fails to address whether a derivative suit can suffice to adequately compensate the injured shareholder. Daniel S. Kleinberger and Imanta Bergmanis, *Direct vs. Derivative, or What's a Lawsuit Between Friends in an "Incorporated Partnership?"* 22 Wm Mitchell L Rev 1203, 1265 n 315 (1996). Since that is the ultimate goal should the plaintiff prevail on the evidentiary burden, this flaw seriously weakens the benefit from an adoption of the rule.

[¶ 64.] Beyond the policy considerations, which do not support an adoption of the ALI rule in South Dakota, when one applies the ALI criteria to the facts of this case, it is also found wanting. The first criterion to supposedly guide the trial court's discretion is whether invocation of the rule will unfairly expose the corporation or the defendants to a multiplicity of actions. In reality, this provided no guidance to the trial court in this action as all shareholders and the corporation were already parties to the suit. This apparently is a common occurrence in ALI cases. *See Kleinberger, supra*, 1267–68.

[¶ 65.] The second criterion is whether adoption of the rule will materially prejudice the interests of creditors of the corporation. Given BHJMC's recent financial tailspin, the confidence of the creditors in BHJMC to survive this condition and meet its financial obligations in the future would be best served by paying the millions awarded as

---

16. South Dakota is a state that contains substantial numbers of small corporations given the number of independently owned businesses and farms. Those who operate and manage these farms and businesses, often the majority shareholders, should not be subject to the demands of minority shareholders whose concern may be solely that of dividends and not the farm or business itself. Many of these small corporations and their management are ill-prepared to invest the time and money required to fend off a minority shareholder suit and are therefore influenced by the mere threat of such litigation.

damages, to BHJMC rather than individually to Landstrom, if there were a basis to award damages in the first place.

[¶ 66.] Finally, there is the question of whether requiring a derivative action might result in an unfair distribution of the recovery among all interested persons. A key reason the trial court permitted Landstrom to pursue an individual action was:

> that requiring a derivative action might result in a distribution to BHJMC and the shareholders which was inequitable as Landstrom is suing the only other shareholders who would then participate in the majority of the relief should Landstrom prevail.

This reasoning is flawed. In a derivative suit, the defendants pay to the corporation the total damages occasioned by their wrongful conduct. The value of a plaintiff's shares are increased according to the percentage of stock owned. This provides no windfall to the defendants as they are paying the total amount of damages. When defendants pay the total amount of damages out of one pocket to restore the corporation to its original value, the fact that the value of their own stock is also returned to the predamage level does not put the same amount of money in the individual defendant's other pocket.[17]

> The diminution in value of a stockholder's investment is a concommitant of the corporate injuries resulting in lost profits. *A fortiori*, any redress obtained by the corporations would run to the benefit of their stockholders, and to permit the latter to proceed with those claims would permit a double recovery.

*Meyerson*, 448 N.W.2d at 134.

[¶ 67.] The end result of the ALI rule may be what occurred here, the majority shareholders are forced by litigation (or even in some cases, the threat of it) to buy out the minority shareholders' shares "which corporate law rarely if ever requires." *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 162 (7thCir.1996) (criticizing the proposed ALI rule). For all of the above reasons we decline to adopt the ALI rule.[18]

[¶ 68.] An alternate basis for upholding the individual verdict for Landstrom would be to show she sustained a special injury. *Jepsen*, 10 N.W.2d at 750. This special injury must be separate and distinct from the injury suffered by other shareholders, not injury separate and distinct from an injury suffered by the corporation. *Meyerson*, 448 N.W.2d at 134. With the evidentiary failure to establish her individual causes of action, her claim for special injury must fail. As such, it was error for the trial court to allow Landstrom individual recovery rather than to pursue a derivative claim against the defendants for failure to properly direct BHJMC. Thus, the verdict for $4 million against the defendants for failure to properly direct the corporation must be reversed.

[¶ 69.] The remaining causes of action alleged herein by Landstrom present distinct or separate injuries to her not incurred by the remaining shareholders. As such, these claims are not governed by the derivative rule and will be addressed seriatim.

[¶ 70.] **4. Did Landstrom fail to prove essential elements of tortious interference with a business relationship or expectancy?**

[¶ 71.] The jury found that Landstrom met her burden of proof on this cause of

---

17. As an example, assume total damages to a corporation are $100,000. The defendants pay $100,000 out of one pocket to the corporation. Assuming also that there are three equal shareholders one who is the plaintiff and the other two the defendants, the value of the plaintiff's stock is restored to its predamage value by adding $33,-333.33. The fact that the value of the defendants' stock is also returned to its predamage level by adding $66,666.66 does not put $100,000 in defendants' other pocket, nor detract from the plaintiff's full recovery of the original value of plaintiff's stock.

18. It would appear that those courts which have adopted the ALI rule have done so when faced with claims of fraud or freeze-outs, neither of which were alleged or proven here. *See, e.g., Caswell v. Jordan*, 184 Ga.App. 755, 362 S.E.2d 769 (1987); *Thomas*, 250 Ga. 772, 301 S.E.2d 49; *Barth*, 659 N.E.2d 559 (Ind.1995); *W & W Equip. Co., Inc. v. Mink*, 568 N.E.2d 564 (Ind.Ct. App.1991); *Richards*, 19 Kan.App.2d 950, 879 P.2d 638; *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989) *app. after remand*, 83 Ohio App.3d 501, 615 N.E.2d 294 (1992); and *Schumacher*.

action and awarded her $10 million in damages. This was characterized at trial as an interference with "prospective economic advantage."

[¶ 72.] We interpret the facts on a basis most favorable to upholding the jury's verdict.

> Our standard of review of the circuit court's denial of a directed verdict and of the jury's determination in favor of [the] plaintiff is well established. We must examine the evidence in the light most favorable to the non-moving party and give [her] the benefit of all reasonable inferences. *Robinson v. Mudlin,* 273 N.W.2d 753, 755 (S.D.1979). The moving party is entitled to evidentiary consideration only where its evidence is uncontradicted or tends to amplify, clarify or explain the evidence in support of the verdict of the jury for the prevailing party. *Nugent v. Quam,* 82 S.D. 583, 152 N.W.2d 371, 374 (1967).
>
> In such a context, it becomes our task to review the record and determine whether there is any substantial evidence to allow reasonable minds to differ. *Haggar v. Olfert,* 387 N.W.2d 45 (S.D.1986). This court does not weigh the evidence and substitute its judgment for that of the jury. *Robinson, supra;* Berg v. Sukup Mfg., 355 N.W.2d 833, 835 (S.D.1984).

*Westover v. East River Elec. Power,* 488 N.W.2d 892, 896 (S.D.1992). We must then decide whether under this factual scope of review, Landstrom has established her cause of action.

[¶ 73.] We recognized the cause of action of tortious interference with business relationships or expectancies in *Tibke v. McDougall,* 479 N.W.2d 898 (S.D.1992). Therein we held the plaintiff must prove the following essential elements to prevail on her claim:

1. the existence of a valid business relationship or expectancy;

2. knowledge by the interferer of the relationship or expectancy;

3. an intentional and unjustified act of interference on the part of the interferer;

4. proof that the interference caused the harm sustained; and,

5. damage to the party whose relationship or expectancy was disrupted.

*Tibke,* 479 N.W.2d at 908. *See also Nelson v. WEB Water Dev. Ass'n, Inc.,* 507 N.W.2d 691, 699 (S.D.1993).

[¶ 74.] The Defendants focus on the first essential element, arguing Landstrom failed to show a valid business relationship or expectancy. They claim Landstrom identified no specific potential purchaser for her stock or a valid business expectancy of the sale of that stock with which to interfere. In fact, they note Landstrom admitted at trial she did not even try to sell her stock.

Q: What price had they agreed to sell?

A: We hadn't discussed a price.

Q: What time frame had they agreed to sell?

A: We hadn't discussed a time frame.

Q: To whom were they going to sell?

A: We didn't have a buyer.

[¶ 75.] These admissions by Landstrom plainly contradict the first element required to prevail on her claim of tortious interference, that being the existence of a valid business relationship or expectancy. *Tibke,* 479 N.W.2d at 908. As Devereaux points out, for this cause of action, there must be a "triangle"—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party. In *Tibke,* we held that to establish a "valid business relationship or expectancy," there had to be a showing of a "contract or business relationship" between the plaintiff and an identifiable third party. *Id.* at 908–09.

[¶ 76.] In *Nelson,* 507 N.W.2d 691, we further determined that a corporate director cannot be held personally liable under this cause of action for conduct taken under a contract entered into by the corporation because the director can only act in the director's official capacity on behalf of the corporation. We noted that to hold otherwise would make the director liable for interfering with a business expectancy between a plaintiff and a director with no identifiable third party. *Id.* at 700.

[¶ 77.] If a plaintiff's claim, "distilled to [its] essence," is that the purported tortious conduct was a breach of contract solely between the parties, then the claim must fail. *DP Serv., Inc. v. Am Int'l,* 508 F.Supp. 162, 167 (N.D.Ill. 1981). "One contracting party does not have a cause of action against the other for conspiring to breach their [own] contract or for wrongfully interfering with its own contract." *DP Serv., Inc.,* at 168.

[¶ 78.] Landstrom concedes that she had no identifiable third party with whom to sell her stock. She relies on cases from other jurisdictions which she views to hold there does not need to be an underlying contract to prove tortious interference with a prospective contractual relationship. *See Wasalco v. El Paso County,* 689 P.2d 730, 732 (Colo.App. 1984). However, the *Wasalco* court further held "there must be a showing of intentional and improper interference by the defendant which prevented formation of a contract between plaintiff and *the third party.*" *Id.* (emphasis added). In *Verkin v. Melroy,* 699 F.2d 729, 732 (5thCir.1983), another case cited by Landstrom, the law of Texas, which was applied to the claim of tortious interference with a prospective contractual relationship, required there be a "reasonable probability" that the plaintiff would have entered into a contractual relationship with a third party but for the defendant's actions. The jury therein found this element was satisfied where the specific third party was identified and the realtor plaintiffs testified to the existence of other prospective buyers as well.

*Id.* at 732–33. Further, in *Breslin v. Vornado, Inc.,* 559 F.Supp. 187 (E.D.Pa.1983), cited by Landstrom, the court found plaintiffs had identified a specific third party and specific contract terms. *See also Kelly–Springfield Tire Co. v. D'Ambro,* 408 Pa.Super. 301, 596 A.2d 867, 871 (1991); *McCue v. Deppert,* 21 N.J.Super. 591, 91 A.2d 503, 506 (1952).[19]

[¶ 79.] Therefore, we hold that Landstrom failed to establish the first element of her claim of tortious interference. Our affirmance on this issue would overrule *Tibke's* requirement of an identifiable third party. This we are unwilling to do. Recognition of Landstrom's argument would radically modify the existing cause of action to become, as Shaver states, intentional interference with subjective aspirations to consider negotiating for a prospective economic advantage.[20] Reduced to its essence, such a modification would allow the maintenance of this cause of action based on the subjective intent of a minority shareholder who deems himself or herself wronged despite having taken no action to establish a valid business relationship.

[¶ 80.] Moreover, compounding Landstrom's failure to establish the first element of *Tibke* is the trial court's erroneous instruction to the jury on this point. The instruction provided to the jury, under which it found in favor of Landstrom on this cause of action, contradicted *Tibke's* requirement to identify a third party or even provide evidence of prior business dealings. This is

---

19. A review of Landstrom's cited authority weakens her argument by two additional points. First, some of Landstrom's cited authority addresses the sufficiency of pleadings rather than the sufficiency of proof after a trial. *See, e.g., Kelly–Springfield Tire Co., supra; Breslin, supra.* The court in *Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1125 (N.D.Ill.1995) noted the difference between standards for meeting the pleading requirements of a tortious interference claim and those for meeting the evidentiary requirements. In *Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 24 Ill.Dec. 573, 385 N.E.2d 714, 721 (1978), the court observed that while the pleadings require alleging an "identifiable" rather than "identified" third party with whom the plaintiffs had a business expectancy, "the third party's specific identity or name is to be revealed at a subsequent time, such as trial." Second, it appears that in each of the cases cited

by Landstrom, there was an identified third party and a specific economic advantage. *See, e.g., McCue, supra.*

20. *In Celex Group, Inc.,* the federal district court, applying Illinois state law, rejected an argument similar to Landstrom's that there need not exist an identifiable third party, observing that:

In the absence of such a requirement, liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate. We are aware of no authority indicating that the Illinois courts construe the expression 'valid business expectancy' to encompass all *possible* relationships with *potential* customers regardless of whether such customers even ever contemplated a relationship with the plaintiff.

877 FSupp at 1125–26, n19 (emphasis original).

clear error requiring reversal of the jury's verdict on this issue.

[¶ 81.] This cause of action is the recognition that valid business relationships and expectancies are entitled to protection from unjustified interference. It is not to allow an "end run" around the buy-sell agreement which the jury found valid.[21] Landstrom's testimonial admissions preclude the relief she seeks under this cause of action. She failed to show causation as to damages. In essence, the discussions of sale of stock to a third party never got outside the boardroom door. We hold that the trial court erred in not granting the Defendants' motion for a directed verdict or judgment notwithstanding the verdict on this issue.[22] For Landstrom's failure to comply with the first requirement of the *Tibke* test, we reverse.[23]

[¶ 82.] **5. Did Shaver breach a fiduciary duty to Landstrom by failing to disclose the veto power provision in the 1987 revision to the 1977 buy-sell agreement?**

[¶ 83.] Shaver appeals the jury's award to Landstrom of $4 million against him for finding that he breached a fiduciary duty to Landstrom by failing to disclose to her the insertion of the veto provision in the 1987 amendments to the 1977 buy-sell agreement.

[¶ 84.] The existence of a fiduciary duty and the scope of that duty are questions of law for the trial court. *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 839 (S.D.1990). In *Case* at 890, we held that directors of a corporation occupy a fiduciary position in respect to the corporation and its shareholders, and as such are required to exercise the utmost good faith in all transactions pertaining to a director's duty. *See also Mobridge*

*Community Indus. v. Toure*, 273 N.W.2d 128, 133 (S.D.1978); *Schurr v. Weaver*, 74 S.D. 378, 384, 53 N.W.2d 290, 293 (1952).

[¶ 85.] We are persuaded by the trial court's findings of fact that Shaver had the 1987 veto provision created for his own self-interest and failed in his fiduciary duty to fellow Director Landstrom to tell her of its existence. We held in *Schurr* that a director of a corporation has a duty to make a full and frank disclosure of the circumstances in a deal affecting the corporation and was not to undertake such dealing without sanction of the corporation. 74 S.D. at 384, 53 N.W.2d at 293.

[¶ 86.] However, Shaver passed away on November 22, 1992. With his death also died any veto power under the agreement.

[¶ 87.] Shaver argues that Landstrom sustained no damages and thus the jury's verdict of $4 million is insupportable. The rule against uncertain damages applies to damages that are not definite or certain results of the wrong. "Uncertainty as to the fact is fatal to recovery, but uncertainty as to the measure or extent of the damages does not bar recovery." *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114, 118 (S.D.1977) (*citing Kowing v. Williams*, 75 S.D. 454, 459, 67 N.W.2d 780, 783 (1954)). *See also Wang v. Bekken*, 310 N.W.2d 166, 167 (S.D.1981).

[¶ 88.] Landstrom points to no damages other than the arguments she has already presented under her intentional interference with business relations and expectancy cause of action. She candidly admitted this fact at trial:

Q: How much of it is because they didn't sell the company, how much of the damage?

A: No, I don't think any of it.

---

**21.** A recovery under this cause of action would provide Landstrom with immediate compensation. If she had proceeded to sell her stock to the corporation or other shareholders under the valid 1977 buy-sell agreement, her payments would have been spread out over a 22–year period.

**22.** There may well be a factual situation where the majority shareholders so totally dominate a minority shareholder that the minority shareholder is precluded in any meaningful manner

from attempting to even solicit a sale of his or her stock which may give rise to some type of legal redress without the identification of a specific existing third party as the probable purchaser of stock. However, we need not address this theoretical issue at this time as the facts of this case do not fall within that type of situation.

**23.** As Landstrom failed on her burden of proof on the first point, an in-depth examination of the remaining Tibke elements is unnecessary.

As she had no identifiable third party purchaser or valid objective expectancy of one, she sustained no damage by the veto provision or the improper manner it came to be. While we do not condone the actions of Shaver, we must hold that they were not the cause of any damage sustained by Landstrom. *See, e.g., Staab v. Cameron*, 351 N.W.2d 463, 466 (S.D.1984). The trial court should have granted the Defendants' motion for a directed verdict or judgment notwithstanding the verdict on this issue. As such the jury's verdict on this cause of action must be reversed.

[¶ 89.] **6. Did the trial court err in ordering a "remittitur" on the negligence verdict for Landstrom against Shaver?**

[¶ 90.] This is a notice of review issue brought by Landstrom. The jury returned a $3 million verdict against Shaver for negligently misrepresenting the 1987 revision to Landstrom by failing to disclose the veto power provision. At a post-trial hearing, the trial court ordered a remittitur on the grounds that this award was duplicative with the award against Shaver for breach of fiduciary duty.

[¶ 91.] Ordinarily, if a trial court orders a remittitur based on excessive damages, it is conditional with the plaintiff receiving the option of a new trial. *Shippen v. Parrott*, 1996 S.D. 105, ¶ 30, 553 N.W.2d 503, 511; *Smith v. Highmore Farm Ltd., Partnership*, 489 N.W.2d 908, 914 (S.D.1992). However, here, the trial court did not hold that the damages were legally awardable although excessive, but rather that they were totally duplicative of the breach of fiduciary duty award. As a remittitur is defined as "money damages awarded by a jury [that] are grossly excessive as a matter of law. . . ." *Smith*, 489 N.W.2d at 913 n2, the complete striking of the damages of the negligence count although labeled a remittitur, was not one. We have held that duplication of damages of the same nature and purpose are not appropriate. *Mash v. Cutler*, 488 N.W.2d 642, 646 (S.D.1992). Here, however, with the fiduciary verdict now overturned against Shaver, the basis for the trial court's ruling no longer exists.

[¶ 92.] Nevertheless, we hold Landstrom has failed to establish any damages for this cause of action for the same reasons as set forth in the two previous issues. We affirm on this issue.

[¶ 93.] **7. Did the trial court err in holding that the individual Defendants were not entitled to indemnification from BHJMC?**

[¶ 94.] Landstrom's fourth amended complaint sought judgment invalidating any indemnification of the individual Defendants, Shaver, Landstrom and Devereaux by BHJMC. BHJMC had advanced $429,153.72 to the individual Defendant shareholders for attorneys' fees and costs incurred in defending themselves in this action. The trial court held that the Defendant shareholders were not entitled to indemnification from BHJMC and that BHJMC was entitled to a judgment against the Defendants for funds advanced by BHJMC to them for attorneys' fees, costs and expenses incurred by them in the defense of this action.

[¶ 95.] Defendant Shaver appeals this ruling. He argues the Defendant shareholders are entitled to indemnification absent evidence of bad faith which, Shaver claims, does not exist. He relies upon SDCL 47-2-58.2 which allows indemnification if a director acted in good faith and in a manner that a person reasonably believed to be in, or not opposed to, the best interests of the corporation.

[¶ 96.] SDCL 47-2-58.2, 47-2-58.8 and 47-5-27 all authorize corporate indemnification. However, this statutory authorization is not a mandate, but allows the corporation to indemnify at its discretion. Under SDCL 47-2-58.8, a corporation is prohibited from including in its articles of incorporation any provision which eliminates or limits the personal liability of a corporate director for breaches of the director's duty of loyalty to the corporation or its shareholders for acts or omissions not in good faith or which involve intentional misconduct or knowing violations of law or for any transaction from which the director derived an improper per-

**20**

sonal benefit.[24] SDCL 47–5–27 requires that a director act in good faith. It contains no authorization for indemnification absent this good faith conduct.

[¶ 97.] The current policy of BHJMC concerning indemnification of its corporate directors is set forth in a bylaw adopted in September of 1989. In conformity with South Dakota law, the bylaw provides for indemnification where the director "acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interest of the corporation[.]"

[¶ 98.] Given the fact we have reversed the causes of action which formed the basis for the denial of indemnification of the shareholder Defendants, the trial court's refusal to allow indemnification by BHJMC is also reversed.

### Conclusion

[¶ 99.] We affirm on issues one and six and reverse the remaining issues. The case is remanded to the trial court for further proceedings consistent with a derivative action should Landstrom elect to pursue it.

[¶ 100.] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.

---

24. This prohibition also reaches a corporation's bylaws and resolutions which must be consistent with its articles. See SDCL 47–2–50 and SDCL 47–5–25.